**Michael S. THOMPSON and Christi Thompson, Respondents,**

v.

**BROWN & WILLIAMSON TOBACCO CORPORATION and Philip Morris USA Inc., Appellants.**

No. WD 63897.

Missouri Court of Appeals, Western District.

Aug. 22, 2006.

Application for Transfer to Supreme Court Denied Sept. 26, 2006.

Application for Transfer Denied Dec. 19, 2006.

Kenneth B. McClain, Scott B. Hall, and
Christopher R. Miller, Independence, MO,

Gregory Leyh, Gladstone, MO, for Respondents.

Thomas E. Deacy, Jr., Spencer J. Brown, and Brian G. Fedotin, Kansas City, MO, Murray R. Garnick and James M. Rosenthal, Washington, D.C., for Appellant Philip Morris USA Inc.

Robert H. Klonoff, Washington, DC, Frank C. Woodside, III, and Mary–Jo Middelhoff, Cincinnati, OH, for Appellant Brown & Williamson Tobacco Corporation.

Before SPINDEN, P.J., and HOWARD and HOLLIGER, JJ.

VICTOR C. HOWARD, Judge.

Brown and Williamson Tobacco Corporation ("B & W") and Philip Morris USA Inc. ("PM USA") appeal the judgment of the trial court awarding damages to Michael Thompson for personal injury based on negligence and strict product liability for product defect and failure to warn, and to his wife, Christi Thompson, for loss of consortium resulting from Michael Thompson's 30–year history of smoking cigarettes which led to his developing laryngeal cancer. B & W and PM USA appeal the trial court's denial of their motion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial, filed after judgment in the personal injury jury trial, for failure to make a submissible case on the negligence, strict liability, and consortium claims. They also appeal the trial court's permitting the addition of the loss of consortium claim, its giving of a comparative fault instruction, its refusing to give other certain jury instructions offered by the appellants, and its admitting of certain evidence.

## Factual Overview

Michael Thompson began smoking Marlboro cigarettes manufactured by PM USA in 1964 at the age of 14, continuing to smoke them until switching brands to GPC Light cigarettes manufactured by B & W in 1992. In February 1997, Michael Thompson was diagnosed with laryngeal (throat) cancer, which required four surgeries and radiation treatment. On August 23, 2000, Michael Thompson sued B & W and PM USA, the manufacturers of the cigarettes which he smoked, alleging personal injury based on negligence and strict product liability for defective design and failure to warn. On June 3, 2002, Michael Thompson amended his claim to include concealment and conspiracy claims, and sought to add his wife, Christi Thompson, to the case to add a claim of loss of consortium. At trial, the jury found in favor of Michael Thompson on the claims of negligence and strict liability product defect, and awarded damages in the amount of $1,593,508.[1] The award was reduced by the jury finding comparative fault, assessing 50% to Michael Thompson, 40% to PM USA, and 10% to B & W. The jury found in favor of the defendants on the claims of concealment and conspiracy. The jury found in favor of Christi Thompson on her loss of consortium claim, and awarded damages of $500,000, which was also reduced by the comparative fault percentages.

## Michael Thompson's Smoking and Health History

Michael Thompson testified that, in 1963, at the age of 13, he smoked his first cigarette. During the time he was growing up in Grandview, Missouri, 50% of

---

**1.** The negligence claim, which the jury found in favor of Michael Thompson, included a failure to warn element against PM USA for pre–1969 advertising. On the independent strict liability failure to warn claim against PM USA, the jury found in favor of the defendants.

Americans smoked cigarettes, including 70% of American males, and that included almost all of Michael Thompson's friends and most of the adults he knew, including his parents. When he smoked his first cigarette, he did not know that smoking was addictive or that it caused cancer. There were no warning labels on the packages at that time. Even so, he admitted that no warning label or parental punishment would have deterred him, as a teenager, from smoking at that time.

About a year after he tried his first cigarette, Michael Thompson started smoking Marlboro cigarettes, which were manufactured by PM USA. He said that he was influenced by a lot of his classmates who smoked Marlboros. Growing up, he and his family watched a lot of Western-themed television shows, and he recalled television advertisements for Marlboros, noting that he started smoking Marlboros because he "wanted to be like the cowboy" depicted in the ads.

From 1964 to 1990, Michael Thompson continued to smoke 1½ to 2 packs of Marlboro cigarettes per day. Michael Thompson volunteered for military service in 1969, and while serving in Vietnam, cigarettes were cheaply and readily available to him, and even supplied in military ration kits. He switched to Marlboro Lights in 1987 or 1988 because he thought that it was a way to cut back on cigarette use. In 1992, Michael Thompson switched to GPC Light cigarettes, manufactured by B & W, because they were less expensive than Marlboros.

About the time that Michael Thompson began smoking cigarettes regularly, the United States Surgeon General issued his first report on smoking and health, which concluded that smoking caused fatal diseases like cancer. In 1965, Congress passed the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331–1340, which required every package of cigarettes to bear the warning: "Caution: Cigarette Smoking May Be Hazardous To Your Health." This warning was modified in 1969 to say: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous To Your Health." The warning was modified again in 1985 to four rotating warnings, including: "Smoking Causes Lung Cancer, Heart Disease, and Emphysema, and May Complicate Pregnancy," and "Quitting Smoking Now Greatly Reduces Serious Health Risks."

Michael Thompson testified that he remembered seeing some of those warning messages over the years, but they had no effect on his decision to smoke, because he thought that any health risks applied to older people. He attempted to quit smoking on a couple of occasions, but he never lasted more than a day because it made him grouchy, anxious, and stressed out. He said that he did not know that nicotine was addictive and did not know that the symptoms he felt were those of withdrawal from the nicotine. He switched to a "light" brand of cigarettes, which were advertised as yielding less tar and nicotine per cigarette than regular cigarettes, but did not know that he was likely getting the same amount of tar and nicotine.

In January 1997, Michael Thompson went to the doctor for treatment of a persistent sore throat. He was subsequently diagnosed with laryngeal cancer, which his doctors said was the result of his 30–year history of smoking. He stopped smoking on February 11, 1997, on the day he entered the hospital to have his cancer surgically removed. During this surgery, his voice box was completely removed, along with a portion of his tongue, a portion of his throat, lymph glands on both sides of his neck, and all of his teeth. Following this surgery, he developed an infection, which required reconstructive

surgery of his throat. At that time, doctors found residual evidence of cancer, and Michael Thompson underwent radiation therapy. Because his neck wounds were slow to heal, surgeons later had to perform a gastrostomy, placing a tube directly into his stomach so that food and medications could enter his body without irritating his throat. Following radiation treatment, Michael Thompson underwent a fourth surgery to reconstruct his throat. This involved the transplanting of skin and tissue from his arm to his neck and throat. Michael Thompson now speaks with the aid of a medical device and has continuing pain, but is cancer-free. His medical condition prevents him from resuming his prior career as a security officer for a large company.

## Procedural History

On August 23, 2000, Michael Thompson sued B & W and PM USA,[2] seeking compensatory and punitive damages, asserting claims of negligence and strict product liability. On June 3, 2002, Michael Thompson filed an amended petition, specifying the following claims: (1) negligence against both defendants, including negligent design against both, and negligent failure to warn before 1969 against PM USA;[3] (2) strict liability for product defect against both defendants and strict liability failure to warn prior to 1969 against PM USA; (3) concealment against both defendants; and (4) conspiracy against both defendants. In a fifth claim, Michael Thompson sought to add his wife, Christi Thompson, to the lawsuit so that she could bring a loss of consortium claim. Just prior to trial, B & W and PM USA moved

for summary judgment with regard to the consortium claim, arguing that it was barred by the five-year statute of limitations, but that motion was denied.

In its answers to Michael Thompson's complaint, PM USA asserted the affirmative defenses of failure to mitigate injury, assumption of the risk, and knowledge of open and obvious dangers. B & W asserted the affirmative defenses of comparative fault, assumption of the risk, and knowledge of open and obvious dangers. Immediately prior to the beginning of jury selection in the trial, B & W and PM USA filed a notice that they specifically waived the affirmative defense of comparative fault.

Trial began on October 3, 2003, in the circuit court of Jackson County, Missouri. Notwithstanding the defendants' notice of waiver of the defense, the Thompsons requested a jury instruction on comparative fault. The circuit court granted the request with regard to the claims for product defect, failure to warn, and negligence. As noted above, the jury returned verdicts in favor of Michael Thompson on the strict liability for product defect and negligence claims, and for Christi Thompson on the loss of consortium claim. The jury assessed comparative fault at 50% for Michael Thompson, 40% for PM USA, and 10% for B & W, and reduced the damage awards accordingly. The jury did not award any punitive damages.

B & W and PM USA filed a motion for judgment notwithstanding the verdict or, alternatively, motion for a new trial, on multiple grounds, alleging that the trial court erred in submitting a comparative

**2.** The original petition also listed other defendants who were later dismissed from the suit.

**3.** The Federal Cigarette Labeling and Advertising Act, as amended in 1969, preempts failure to warn claims with respect to advertising or promotion after that date. *Cipollone*

*v. Liggett Group, Inc.*, 505 U.S. 504, 524, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Because Michael Thompson did not smoke B & W brand cigarettes until after 1969, he could not assert a failure to warn claim against B & W.

fault instruction when the defendants had not asked for one, that the Thompsons had failed to make submissible cases on several of their claims, and that the loss of consortium claim was time-barred. That motion was denied on March 9, 2004, and B & W and PM USA filed this notice of appeal on the same day. Specifically, B & W and PM USA appeal the trial court's denial of their motion contending that the Thompsons failed to make a submissible case on their negligence and strict liability product claims, negligent failure to warn claim and consortium claim. They also contend that the trial court erred in submitting the comparative fault instruction, in refusing to submit certain jury instructions, in admitting testimony of a failure to warn after a certain date, and in admitting into evidence certain internal company documents. The Thompsons have not cross-appealed or challenged the amount of damages. B & W and PM USA challenge only the finding of liability, but not the amount of damages.

## I. Strict Liability and Negligent Design Claims and Failure to Introduce Evidence of Alternative Design

In their first point, B & W and PM USA contend that the trial court erred in denying their motion for a judgment notwithstanding the verdict because Michael Thompson failed to make a submissible case on his strict liability product defect and negligent design claims. They contend that Michael Thompson failed to identify any actionable defect in their cigarettes because he did not introduce evidence of an alternative design that would have prevented his injuries. B & W and PM USA argue that the mere fact that a product may be dangerous is not enough to establish liability on a product defect claim, but that plaintiffs must also prove that the failure to use a feasible alternative design caused the injury. In doing so, B & W and PM USA misstate the law in Missouri as to strict tort liability, and cite no Missouri authority that alternative design is a requirement in a negligence claim.

Our review of a denial of a judgment notwithstanding the verdict ("JNOV") is governed by the pronouncement of the Missouri Supreme Court which recently held:

The standard of review of denial of a JNOV is essentially the same as for review of denial of a motion for directed verdict. A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. *Giddens v. Kansas City Southern Railway Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000). In determining whether the evidence was sufficient to support the jury's verdict, the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict. *Id.* This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. *Id.*

*Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456–57 (Mo. banc 2006). Our review of whether substantial evidence exists is de novo, and is that evidence, "which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Kenney v. Wal–Mart Stores, Inc.*, 100 S.W.3d 809, 814 (Mo. banc 2003) (internal quotation marks and citation omitted).

■ In arguing that Michael Thompson failed to make a submissible case, obliquely, B & W and PM USA contend that Missouri has adopted the "reasonable al-

ternative design/risk-utility" test of the Restatement (Third) of Torts; Products Liability, sec. 2(b).[4] However, the Missouri Supreme Court has consistently rejected that test, along with the "consumer expectation" test; first in *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 377–78 (Mo. banc 1986), then in *Newman v. Ford Motor Co.,* 975 S.W.2d 147, 154 (Mo. banc 1998), and most recently in *Rodriguez v. Suzuki Motor Corp.,* 996 S.W.2d 47, 65 (Mo. banc 1999). In its most recent pronouncement, the Missouri Supreme Court specifically said: "This Court again declines the invitation to adopt the reasonable alternative design/risk-utility theory." *Rodriguez,* 996 S.W.2d at 65.

 "[T]he primary inquiry in a design defect case is whether the product—because of the way it is designed—creates an unreasonable risk of danger to the consumer or user when put to normal use." *Nesselrode,* 707 S.W.2d at 375. The term "unreasonably dangerous," as used in section 402A of the Restatement and MAI 25.04, "needs no judicial definition, whether derived from consumer expectations, risk-utility, or otherwise[,]" and "the concept of 'unreasonable danger' is to be treated as an ultimate issue for the jury." *Rodriguez,* 996 S.W.2d at 65 (citing *Nesselrode,* 707 S.W.2d at 378).

█ Although identified as a minority approach, the Missouri Supreme Court has

recognized the value of rejecting an artificial standard, in that, "[a] signal virtue of such a general instruction is that it allows the jury to give the concept of unreasonable danger content 'by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties.'" *Newman,* 975 S.W.2d at 154 (citing *Nesselrode,* 707 S.W.2d at 378). The litigants are certainly entitled to assist the jury in defining the term "unreasonably dangerous" by presenting evidence "that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence." *Id.* The plaintiffs, however, are not required to present evidence of alternative design.[5]

To further strengthen this point, the Missouri Supreme Court declared:

In addition to the force of precedent that *Nesselrode* and *Newman* rejected the risk-utility approach, any further consideration of risk-utility was effectively foreclosed by the enactment of section 537.760, RSMo 1994, as part of Missouri's 1987 tort reform act, which, *inter alia,* codified section 402A of the Restatement (Second) of Torts.

*Rodriguez,* 996 S.W.2d at 65.[6]

██ "To establish liability in a design defect case, the plaintiff bears the burden

---

**4.** Under Restatement (Third) of Torts: Products Liability, § 2(b) (1998), a product is defectively designed "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller . . . , and the omission of the alternative design renders the product not reasonably safe." *Rodriguez v. Suzuki Motor Corp.,* 996 S.W.2d 47, 64 (Mo. banc 1999).

**5.** B & W and PM USA rely on *Siebern v. Missouri–Illinois Tractor & Equipment Co.,* 711 S.W.2d 935 (Mo.App. E.D.1986) for the

proposition that evidence of alternative design was required to make a submissible case. Certainly, the plaintiff may introduce such evidence in support of showing the design was defective and therefore unreasonably dangerous, but under *Nesselrode, Newman,* and *Rodriguez,* such is not required.

**6.** Section 537.760. Products liability claim defined.

As used in sections 537.760 to 537.765, the term "products liability claim" means a claim or portion of a claim in which the plaintiff seeks relief in the form of damages

of proving that the product, as designed, is unreasonably dangerous and therefore 'defective.'" *Stinson v. E.I. DuPont De Nemours & Co.*, 904 S.W.2d 428, 431 (Mo. App. W.D.1995) (citing *Nesselrode*, 707 S.W.2d at 375). "Under Missouri's strict tort liability, a product's design is deemed defective when a preponderance of evidence shows that the design renders the product unreasonably dangerous." *Id.* (citing *Nesselrode*, 707 S.W.2d at 377; *see also*, *Elmore v. Owens–Illinois, Inc.*, 673 S.W.2d 434 (Mo. banc 1984)). Under Missouri law, therefore, Thompson was not required to prove the existence of a reasonable alternative design in order to make a submissible case.[7]

To bolster their argument, B & W and PM USA further contend that if plaintiffs do not have to show that the alleged defects were avoidable, liability could be imposed merely for the act of selling cigarettes. According to B & W and PM USA, this would cause the removal of cigarettes from the marketplace, and they say that such a consequence is foreclosed because Congress has preempted the area of cigarette marketing thereby precluding design defect claims against cigarette manufacturers.

The Supremacy Clause of the United States Constitution, Article VI, provides that state law that conflicts with federal law has no effect. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). Congressional intent to override state law is demonstrated in several ways:

We have recognized that a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, *English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2274–2275, 110 L.Ed.2d 65 (1990), or when state law is in actual conflict with federal law. We have found implied conflict pre-emption where it is "impossible for a private party to comply with both state and federal requirements," *id.* at 79, 110 S.Ct. at 2275, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davi-*

---

on a theory that the defendant is strictly liable for such damages because:

(1) The defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and

(2) The product was used in a manner reasonably anticipated; and

(3) Either or both of the following:

(a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or

(b) The product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a

direct result of the product being sold without an adequate warning.

7. In their reply brief, the appellants make the argument, for the first time, that for this court to decide that "a product defect claim is submissible based on a product's inherent dangers," such would result in staggering ramifications for whole categories of dangerous products such as alcohol, guns, and motorcycles. They cite *Richardson v. Holland*, 741 S.W.2d 751 (Mo.App. S.D.1987), in support. However, *Richardson* was later clarified by *Wilson v. Danuser Mach. Co.*, 874 S.W.2d 507 (Mo.App. S.D.1994), which properly cited *Nesselrode*, 707 S.W.2d at 377, for the applicable standards for a strict liability defective design claim. *Wilson*, 874 S.W.2d at 513–14.

*dowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

*Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, 505 U.S. at 517, 112 S.Ct. 2608.

■ B & W and PM USA's preemption argument rests upon interpretation of Congressional intent as expressed in the Federal Cigarette Labeling and Advertising Act ("FCLAA"), 15 U.S.C. §§ 1331–1340. The Supreme Court in *Cipollone* addressed this issue, and the effect of the preemption provision expressed in 15 U.S.C. § 1334, 5(b), both with respect to the regulation as enacted in 1965, and the language change enacted in 1969. 505 U.S. at 513–16, 112 S.Ct. 2608. Based on the 1965 Act language which stated that: "No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act[,]" the Supreme Court determined that the Act "only pre-empted state and federal rulemaking bodies from mandating particular cautionary statements" and did not prohibit claims under state law for damages. *Cipollone*, 505 U.S. at 514, 519–20, 112 S.Ct. 2608.

The Supreme Court distinguished the amended language of section 5(b) enacted in 1969 as having a broader effect. *Id.* at 520, 112 S.Ct. 2608. After 1969, section 5(b) read: "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in con-

formity with the provisions of this chapter." *Id.* at 515, 112 S.Ct. 2608. The Supreme Court determined that because some common law claims for damages are based upon a requirement or prohibition, some particular common law claims may be preempted by the Act. *Id.* at 520–23, 112 S.Ct. 2608. Some state law claims such as defective manufacturing and safer design are not preempted. *Id.* at 523, 112 S.Ct. 2608. The central inquiry is "whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion,' giving that clause a fair but narrow reading." *Id.* at 523–24, 112 S.Ct. 2608. The Supreme Court thus determined that claims based on state statutes or common law that required as an element of proof failure to provide additional warnings after 1969, beyond those mandated by Congress, were preempted.[8] *Id.* at 524, 112 S.Ct. 2608. However, claims related to "testing or research practices or other actions unrelated to advertising or promotion" were not preempted. *Id.* at 524–25, 112 S.Ct. 2608. The Court further determined that claims regarding breach of express warranty, intentional fraud, and conspiracy to misrepresent or conceal material facts were not preempted. *Id.* at 525–30, 112 S.Ct. 2608. Thus, Congress did not intend to preempt all state law claims, only those related to advertising and promotion after 1969.

B & W and PM USA further contend that Congress has foreclosed a ban on the sale of cigarettes, and that because all cigarettes contain nicotine and are, apparently, inherently dangerous, the only way

---

8. The Court also concluded that fraudulent misrepresentation claims "predicated on a state-law prohibition against statements in advertising and promotional materials that tend

to minimize the health hazards associated with smoking" were preempted. *Cipollone*, 505 U.S. at 527, 112 S.Ct. 2608.

for cigarette manufacturers to avoid liability would be to stop selling cigarettes altogether. In support of their argument, B & W and PM USA rely on *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

In *FDA,* the Supreme Court denied the FDA's attempt to impose regulatory jurisdiction over cigarettes and smokeless tobacco because it was clear that Congress intended to exclude tobacco from the reaches of the FDA's regulatory power. *Id.* at 156, 120 S.Ct. 1291. The Court noted that up until this time, the FDA had repeatedly declined jurisdiction to regulate tobacco. *Id.* at 145, 151–52, 153, 154–55, 120 S.Ct. 1291. The Court concluded that under the Food, Drug and Cosmetic Act ("FDCA") which governs the actions of the FDA, that given the FDA's classification of tobacco products as being unsafe, if the FDA were to regulate cigarettes, the agency would be required to ban them. *Id.* at 133–36, 120 S.Ct. 1291. The Court found that Congress had recognized that the tobacco industry was important to commerce and had "foreclosed the removal of tobacco products from the market" because it has dealt with tobacco numerous times since 1965 but "stopped well short of ordering a ban." *Id.* at 137–39, 120 S.Ct. 1291. Thus, regulation of cigarettes by the FDA was incompatible with the FDA's jurisdiction. *Id.* at 156, 120 S.Ct. 1291.

In discussing the impact of the 1965 FCLAA, the Supreme Court noted that labeling requirements are an integral aspect of FDA regulation. *Id.* at 148–49, 120 S.Ct. 1291. The Court said:

In this sense, the FCLAA was—and remains—incompatible with FDA regulation of tobacco products. This is not to say that the FCLAA's preemption provision by itself necessarily foreclosed FDA jurisdiction. See *Cipollone v. Liggett Group, Inc.*, 505 U.S., at 518–519, 112 S.Ct. 2608, 120 L.Ed.2d 407. But it is an important factor in assessing whether Congress ratified the agency's position—that is, whether Congress adopted a regulatory approach to the problem of tobacco and health that contemplated no role for the FDA.

*Id.* at 149, 120 S.Ct. 1291.

We find that the opinion in *FDA* was specifically addressing the regulatory authority of the FDA, in light of its jurisdiction under the FDCA, to regulate nicotine in cigarettes as a drug, as compared with the specific statutes regulating tobacco enacted by Congress. We find nothing in our reading of *FDA* that supports B & W and PM USA's argument that Congress has preempted state law liability claims. Furthermore, we decline to accept B & W and PM USA's leap of logic that because the FDCA regulations require that products the FDA regulates must either be safe for intended use, have a therapeutic benefit that outweighs the potential for injury, or, if not, that the product be removed from the market, means that the only way for them to avoid liability for inherently dangerous components of their cigarettes in a state law claim would require an outright ban on their products, a result precluded under federal law.[9]

9. For the first time in their reply brief and in support of their claim that the opinion in *FDA* prohibits any state law claims which would amount to a ban on the sale of cigarettes, B & W and PM USA rely on *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), for differentiation of express preemption and implied conflict preemption. They contend that the holding in *Cipollone* refers to only express preemption of the duty to warn, but that implied conflict preemption read into *FDA* supports their claim. We decline to venture such a broad reading of *FDA*.

██ Under the standards defined by Missouri law, we find ample support in the record that Thompson presented sufficient evidence to make a submissible case on his claim that B & W and PM USA's cigarettes were unreasonably dangerous. A witness for Thompson, Dr. David Burns, a professor of medicine and author or reviewer of every United States Surgeon General's Report on smoking and health published since 1975, testified that Philip Morris knew as early as 1961 that carcinogenic compounds were a component of tobacco smoke. With regard to developing a "safer cigarette," Dr. Burns testified:

> There is a large body of tobacco industry scientific documents that have recently become available that make it clear that they knew how to manipulate the engineering to alter the composition of tobacco smoke in a way that would reduce the carcinogens present, that they had other approaches to reducing the toxicity of the smoke, and they did not implement those approaches. So had they done and followed up on the work that they were doing in the 1960's and the 1970's, we might have had the prospect of a real reduction in the safety—real improvement in the safety of cigarettes.

Dr. Burns testified that the fact that the tobacco industry did not move more quickly in designing safer cigarettes affected his opinion that it was a defective product.

Dr. Burns also testified that Philip Morris marketed "light" cigarettes as less harmful, even though it was aware from its own research that people smoked the cigarettes differently to compensate for the lower tar and nicotine, and effectively got the same amount as with regular cigarettes. Dr. Burns testified that although "light" cigarettes have lower tar and nicotine levels as measured by a smoking machine formerly operated by the Federal Trade Commission, the lower levels were due to the development of high filtration/high ventilation filters on cigarettes containing holes which drew in air and diluted the level of tar in the machine's measurement. Dr. Burns further testified, however, that people, as opposed to the measuring machines, change the way they smoke "light" cigarettes, taking longer and deeper puffs, to satisfy their addiction to nicotine, and as a result, take in as much tar and nicotine as regular cigarettes. Dr. Burns testified that Philip Morris was aware of this, but continued to market "light" cigarettes as less harmful, commenting on a 1987 Philip Morris document that said that "consumers currently have a poor knowledge of cigarettes and nicotine" and that, to consumers, "research show that lights equal mild equal less harmful." Thus, Dr. Burns opined that "light" cigarettes carry the same health risks as regular cigarettes and that "light" cigarette design is misleading and defective.

Dr. Burns further testified about nicotine addiction in general, and specifically opined that Michael Thompson was addicted to the nicotine in cigarettes. He also testified that the tobacco industry has "consistently denied that nicotine played a role in the addiction of cigarette smoking." He testified that the addictive nature of cigarettes makes them defective, stating:

> Because the core reason why people continue to expose themselves to the carcinogens and other toxins in cigarettes is the need to get nicotine from those products. Absent the addiction, people would be able to decide whether or not they wanted to smoke as a free choice. In the presence of addiction[,] that limits their ability to choose whether or not they expose themselves to those carcinogens with the next cigarette.

William Farone, a Ph.D. chemist who worked from 1976 to 1984 for Philip Morris in research and development, testified that the technology was available to remove carcinogenic nitrosamines from cigarette smoke, but that Philip Morris did not take advantage of it. He also testified that technology to remove nicotine from cigarettes had existed since the 1950's. Philip Morris was also doing research to substitute other chemicals into cigarettes to mimic the effect of nicotine, in order to reduce some of nicotine's negative side effects, but that research was terminated because Philip Morris "wished to stop doing research which could then be found in litigation to be damaging or injurious to the company."

Philip Morris documents introduced also stated that "[n]o one has ever become a cigarette smoker by smoking cigarettes without nicotine" and to "think of the cigarette pack as a storage container for a day's supply of nicotine." In response to the Surgeon General's Report in 1981 about the negative effects of smoking, a Philip Morris document stated: "It is our opinion that Philip Morris, or the tobacco industry, take a more aggressive posture to counter attack the antismoking movement. We are suggesting funding studies primarily outside the United States with the intent to publish data which refutes specific assertions by the antismoking forces."

Dr. Farone also testified that although internal company policy was to deny that cigarettes caused disease, his research involved identifying chemicals that cause cancer in cigarette smoke, and that "you can't really make a safer product if you take the position that the product doesn't cause the disease in the first place." He also testified that only cell level research was conducted in the United States by Philip Morris, and that further animal testing was done only in research facilities in Europe so that, if the research produced negative results, it could be protected from litigation in the United States. Dr. Farone also said that some of the research projects he worked on produced some evidence of reducing tar and nicotine levels, but that he had no proof that it had ever been implemented by Philip Morris to produce a safer cigarette.

Dr. Jeffrey Wigand, a biochemist and vice president of research and development for B & W from 1989 to 1993, testified about the practices of B & W with regard to research and related documents pertaining to health and smoking. He testified that the company had lawyers reedit research and meeting documents to prevent negative information from being used against the company in litigation. He said that B & W's public position on the health effects of smoking was that there was no relationship between smoking and health, and that nicotine in cigarettes was there for the taste. He also testified: "Clearly the mantra of the company was we're in the nicotine delivery business and tar is negative baggage. Inside, we clearly understood that nicotine was addictive." He also testified that B & W added ammonia to cigarettes, because B & W was concerned about smokers giving up their addictive habits to smoking, and research showed that ammonia acted to boost the impact of the nicotine in B & W's cigarettes.

Taken as a whole, and viewed in the light most favorable to the plaintiffs, this evidence was sufficient to make a submissible case that the tobacco companies knew that the design of their cigarettes contained addictive nicotine and carcinogenic substances, and was sufficient for the jury to find that the products were unreasonably dangerous as designed. This evidence went beyond a categorical attack on

the danger of cigarettes in general and showed evidence of specific design choices by B & W and PM USA that had the potential to affect Thompson's health during the time period he smoked.

Finally, in this point, we find that B & W and PM USA have provided us with little to review regarding the submissibility of the negligent design claim in failing to cite specific relevant Missouri authority and the corresponding relevant evidence to support such a claim.[10] To the extent the appellants have raised and supported contentions regarding the submissibility of the negligence claim more fully in the following two points, we address the negligence claim there. The first point is denied.

## II. Does Common Knowledge of the Dangers of Smoking Obviate B & W and PM USA's Duty to Warn in a Negligence Claim?

In the second point, B & W and PM USA contend that the circuit court erred in denying their motion for judgment notwithstanding the verdict on the negligence claim because Michael Thompson failed to establish that B & W and PM USA owed him a duty to protect him from the harms of smoking cigarettes in that the risks associated with smoking were commonly known. B & W and PM USA argue that, because "the health risks of smoking cigarettes were well known during the period that Mr. Thompson smoked," as a matter of law, Michael Thompson could not and did not prove that they owed him a duty and, thus, failed to make a submissible case of negligence. In

this point, the appellants contend that there is no duty owed in a defective design claim where the danger is "open, obvious and apparent," or in a failure to warn claim where the risks are "open and obvious or commonly known."

B & W and PM USA ask us to declare that information regarding potential risks of smoking, which may have been available to the general public through various media sources, was sufficient, as a matter of law, to relieve them from any duty to design their product to protect Michael Thompson from developing laryngeal cancer or warn him of the danger of laryngeal cancer due to smoking their product. This is an issue of first impression in Missouri. Although the appellants urge us to adopt the position of several other states, our review of out-of-state cases show that state positions vary on whether knowledge about the health risks of smoking are so common as to permit a court to take judicial notice of the fact and bar a claim as a matter of law. Most courts have looked to their own state's case law and statutes in deciding this issue. In analyzing Missouri law, we find that there exist differences in strict liability and negligence claims with regard to the application of the open and obvious doctrine, and we examine both in answering this complicated question.

### A. Differences of the Open and Obvious Exception in a Strict Tort Liability Claim

The law in Missouri is much more well-defined in consideration of the open and obvious danger exception to the duty to

10. In their original brief, the only reference appellants make to Missouri negligence law is to *Stevens v. Durbin–Durco, Inc.*, 377 S.W.2d 343 (Mo.1964), for the bare proposition that a "manufacturer is not liable as an insurer, and he is under no obligation to make the product accident proof or foolproof." *Id.* at 346–47. However, *Stevens* goes on to say: "The manu-

facturer of a [dangerous product] properly made and *free of latent defects and concealed dangers*, may not be held liable merely because someone was injured while using the product." *Id.* at 347 (emphasis added). Appellants fail to address the applicability of this aspect of *Stevens*.

warn in a strict tort liability claim than with regard to a claim in negligence. In *Miller v. Varity Corp.*, 922 S.W.2d 821, 826 (Mo.App. E.D.1996), the court addressed whether the absence of tractor safety equipment was an open and obvious bar to the plaintiff's strict liability claim. Distinguishing the holding in *Morrison v. Kubota Tractor Corp.*, 891 S.W.2d 422, 428 (Mo. App. W.D.1994) (discussed *infra* ), as applying to negligence claims, the court noted that contributory fault as a complete bar to a plaintiff's strict product liability claim was abolished after the enactment of section 537.765, RSMo, in 1987, and that the doctrine of comparative fault applies. *Id. See also, Egelhoff v. Holt*, 875 S.W.2d 543, 547 (Mo. banc 1994). The court held that under section 537.765.3(3), evidence of the plaintiff's knowledge of an open and obvious defect is not a bar to the claim, but is to be considered by the jury in apportioning fault.[11] *Miller*, 922 S.W.2d at 826.

Strict tort liability for defective design, pursuant to the Restatement, Law of Torts, Second, section 402A, differs from that of negligence in that "[i]n negligence cases the duty owed is based on the foreseeable or reasonable anticipation that harm or injury is a likely result of acts or omissions ... [but that] strict liability in tort is based in part on the foreseeable or reasonably anticipated use of the product ... rather than on the reasonably anticipated harm the product may cause." *Blevins v. Cushman Motors*, 551 S.W.2d 602, 607–08 (Mo. banc 1977) (internal citations omitted). The main inquiry in a strict liability case "is whether the product—because of the way it is designed—creates an unreasonable risk of danger to the consumer or user when put to normal use." *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 375 (Mo. banc 1986). "[T]he focal point of the litigational process is the condition or character of the product and not the character of the defendant's conduct—thereby excising the concept of reasonable care, the limits test of liability in negligence law, from Missouri's rule of strict tort liability." *Id.* (citing *Blevins*, 551 S.W.2d at 608; *see also* Comment a, § 402A). What constitutes the "concept of unreasonable danger," determining whether a product is defective, is a question for the jury.[12] *Id.* at 378. Thus, the elements of proof are different in a strict liability claim than in a negligence claim, and, statutorily, the open and obvious doctrine is not a bar to the claim, but an issue of comparative fault.

## B. Elements of a Negligence Claim

Whether the open and obvious doctrine applies to bar a negligence claim or whether the question of the plaintiff's

---

**11.** Section 537.765, RSMo 2000, provides, in pertinent part:

1. Contributory fault, as a complete bar to plaintiff's recovery in a products liability claim, is abolished. The doctrine of pure comparative fault shall apply to products liability claims as provided in this section.

2. Defendant may plead and prove the fault of the plaintiff as an affirmative defense. Any fault chargeable to the plaintiff shall diminish proportionately the amount awarded as compensatory damages but shall not bar recovery.

3. For purposes of this section, "fault" is limited to:

. . . .

(3) Use of the product with knowledge of a danger involved in such use with reasonable appreciation of the consequences and the voluntary and unreasonable exposure to said danger[.]

**12.** *See also, Nesselrode*, 707 S.W.2d at 382 (strict liability for failure to warn recognizing "that a product may be rendered unreasonably dangerous and therefore actionable because of the absence of a warning concerning use or misuse, or because the warning that has been given is informationally deficient").

knowledge is a question for the jury requires examination of the elements of a negligence claim and cases where the open and obvious doctrine has been applied, as well as consideration of the adoption of comparative fault. In a negligence action, the plaintiff must allege and prove facts which show: "1) the existence of a duty on the part of the defendant to protect plaintiffs from injury; 2) failure of defendant to perform that duty; and 3) injury to plaintiffs resulting from such failure." *Hill v. Gen. Motors Corp.*, 637 S.W.2d 382, 384 (Mo.App. E.D.1982) (citing *Scheibel v. Hillis*, 531 S.W.2d 285, 288 (Mo. banc 1976)). "The particular standard of care that society recognizes as applicable under a given set of facts is a question of law for the courts. Whether a defendant's conduct falls short of the standard of care is a question of fact for the jury." *Harris v. Niehaus*, 857 S.W.2d 222, 225 (Mo. banc 1993). Whether a duty exists is a matter of law, and "[f]or purposes of determining whether a duty exists, [the Missouri Supreme Court] has defined foreseeability as the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it." *Lopez v. Three Rivers Elec. Coop., Inc.*, 26 S.W.3d 151, 156 (Mo. banc 2000).

 "Missouri has long recognized that a manufacturer has the duty to warn ultimate users of its products or articles which are inherently dangerous or are dangerous because of the use to which they are put." *Hill*, 637 S.W.2d at 384 (citing *Orr v. Shell Oil Co.*, 352 Mo. 288, 177 S.W.2d 608, 612 (1943)).

The rule is now well settled that a duty is imposed upon the one who furnishes an article which he knows, or ought to know, to be peculiarly dangerous to give notice of its character or bear the natural consequences [sic] of his failure to do so. This rule originated as an exception to the general rule of non-liability where no privity of contract exists, and was applied in cases involving injuries from poisonous drugs, chemicals, explosives or articles inherently dangerous to person or property. The rule has been extended to cover articles not only inherently dangerous in their nature, but dangerous because of the use to which they are to be put by whoever may use them for the purpose intended.... The basis of liability is not in contract but arises from a social responsibility to use due care to avoid injuring those persons likely to be injured if such care is not used.

*Orr*, 177 S.W.2d at 612 (internal citations omitted).

 A supplier has a duty to warn of foreseeable and latent dangers related to the proper and intended use of the chattel or product. *Hill*, 637 S.W.2d at 385. Section 388 Restatement (Second) of Torts, "Chattel Known to be Dangerous for Intended Uses," was formally adopted by the Missouri Supreme Court in *Morris v. Shell Oil Co.*, 467 S.W.2d 39, 42 (Mo.1971), which provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

b) has no reason to believe that those for which use the chattel is supplied will realize its dangerous condition, and

c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Id.* The issue in the instant case is whether B & W and PM USA had a duty to inform Michael Thompson of dangerous properties of their cigarettes or whether they are relieved of that duty, as a matter of law, because they had a reason to believe he would realize the dangerous condition of their cigarettes.

■ Comment k of the Restatement (Second) of Torts § 388 (1965), says:

One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him, or of facts which to his knowledge make it likely to be dangerous, if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved. It is not necessary for the supplier to inform those for whose use the chattel is supplied of a condition which a mere casual looking over will disclose, unless the circumstances under which the chattel is supplied are such as to make it likely that even so casual an inspection will not be made. However, the condition, although readily observable, may be one which only persons of special experience would realize to be dangerous. In such case, if the supplier, having such special experience, knows that the condition involves danger and has no reason to believe that those who use it will have such special experience as will enable them to perceive the danger, he is required to inform them of the risk of which he himself knows and which he has no reason to suppose that they will realize.

The emphasis "has always been upon the duty of guarding against *hidden* defects and of giving notice of *concealed* dangers." *Stevens v. Durbin–Durco, Inc.,* 377 S.W.2d 343, 347 (Mo.1964) (emphasis in original). "[T]he manufacturer may be held liable if the defect or danger is latent or concealed, but where the danger is open, obvious and apparent, or the user has actual knowledge of the defect or danger, there is no liability on the manufacturer." *Id.*

In their brief, B & W and PM USA do not address the issue of whether the dangers of the cigarettes they manufacture are latent or concealed. They argue, however, that the dangers of smoking are so "open and obvious" and so commonly known that this knowledge should be attributable to Michael Thompson such that he "realized" the cigarette's dangerous condition sufficient as to obviate, as a matter of law, B & W and PM USA's duty to warn him. We must, therefore, determine in what instances Missouri courts have applied the open and obvious danger exception. We must also determine whether knowledge of a generalized danger in the use of a product is sufficient, or whether it was necessary for Michael Thompson to have had knowledge that cigarettes contained addictive nicotine and carcinogens which caused or contributed to cause his injury, laryngeal cancer.

## C. The Open and Obvious Doctrine as Applied to Negligence Claims

■ Our review of the law in Missouri shows that the "open and obvious" danger limitations sufficient to bar a claim, as a matter of law, relate primarily to those dangers which are visibly ascertainable, particularly in premises liability cases and in some products cases where the user has the experience to know and observe the danger presented by a visual inspection of the product. Barring a claim as a matter of law is a drastic step, and the court must

be certain that the danger was so obvious that the defendant should not bear any responsibility for resulting damage, and visual evidence is a verifiable confirmation of what is or should have been known to the injured party. This is especially so in light of Missouri's adoption of comparative fault.

Premises liability cases in Missouri have primarily identified open and obvious dangers as those visibly apparent to the plaintiff or discoverable with due care, based on that plaintiff's experience with and knowledge of the condition of the property in question. *Harris v. Niehaus*, 857 S.W.2d 222, 227 (Mo. banc 1993). Although premises liability involves different standards of conduct based upon whether the guest is an invitee, a licensee, or a trespasser, the law relating to invitees is well developed and helpful to our analysis. The Missouri Supreme Court adopted section 343 of the Restatement (Second) of Torts (1965), which, although is different than section 388 in some elements, provides:

> When the plaintiff is an invitee, a possessor of land is subject to liability for injuries caused by a condition on the land *only* if the possessor
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

*Harris*, 857 S.W.2d at 225–26 (emphasis in original). "Under the second element of § 343, when the dangerous condition is so open and obvious that the invitee should reasonably be expected to discover it and realize the danger, a possessor of land does *not* breach the standard of care owed to invitees 'unless the possessor should anticipate the harm despite such knowledge or obviousness.'" *Id.* at 226 (citing the Restatement (Second) of Torts § 343A(1) (1965)).[13] However, an exception to "the 'open and obvious danger' rule applies where a landowner should foresee that invitees, even if using reasonable care, would not appreciate the danger associated with the risk or would be unable to protect themselves from it." *Huxoll v. McAlister's Body & Frame, Inc.*, 129 S.W.3d 33, 36 (Mo.App. W.D.2004). "Whether or not the landowner should have anticipated that an invitee would be harmed, despite an open and obvious hazard, is a matter for the jury." *Hellmann v. Droege's Super Mkt., Inc.*, 943 S.W.2d 655, 659 (Mo.App. E.D.1997).

The *Harris* court addressed the duty of property subdivision trustees to warn a roofing contractor about the dangers of a steep road ending in a lake on which she parked. 857 S.W.2d at 224. Tragically, the roofing contractor's parked car rolled down a hill into a lake, drowning her three small children who were inside the car. *Id.* at 225. The Court held that "[t]he trustees are entitled to expect that their invitees will exercise ordinary perception, intelligence and judgment, discover this obvious condition, appreciate the risk it presented, and take the minimal steps necessary to avert a tragedy." *Id.* at 226. In holding that the trustees owed no duty to warn of the danger of the slope as a

---

**13.** Section 343A states: "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, (unless the possessor should anticipate the harm despite such knowledge or obviousness)." *Hellmann v. Droege's Super Market, Inc.*, 943 S.W.2d 655, 658 (Mo.App. E.D. 1997).

matter of law, the court observed that the slope and lake were clearly visible from the parking spot, and that the trustees were entitled to rely on simple measures an experienced and licensed driver would know to take in such a situation. *Id.* at 226–27.

The court held that barring such a claim as a matter of law was still viable even though comparative fault doctrine applies in Missouri.[14] *Id.* at 227. The majority opinion clarified a previous holding in *Cox v. J.C. Penney Co.,* 741 S.W.2d 28, 29–30 (Mo. banc 1987), which held that a jury instruction which considered a plaintiff's failure to exercise ordinary care in discovering an obvious danger on a property was impermissible as a vestige of contributory negligence in that Missouri had adopted the doctrine of comparative fault. *Id.* We distinguish that aspect of *Harris,* noting that in *Harris,* the issue involved a specific issue of premises liability under section 343 and the danger was visibly obvious, while in the instant case, we are analyzing liability for dangerous products under section 388, and the danger was not visibly observable.

In other premises liability cases, Missouri courts have determined that the question of whether or not the property owner should have anticipated that the invitee might be harmed despite an open and obvious hazard, was a decision for the jury. *See, Hellmann,* 943 S.W.2d 655, 659 (shopper injured in icy grocery store parking lot); *Lewis v. Snow Creek, Inc.,* 6 S.W.3d 388, 393 (Mo.App. W.D.1999) (skier injured by ice hidden under snow at ski slope); *Dieterich v. Pickett,* 114 S.W.3d 293, 296 (Mo.App. W.D.2003) (car washer

injured by damaged drainage grate in car wash bay).

■ Liability in negligence for defective products where the open and obvious doctrine has been applied to defeat the claim as a matter of law relate primarily to products where there is no hidden danger or latent defect and the potential danger is discoverable by visual inspection or actual knowledge of specific potential danger based on the injured party's prior experience. *See, Stevens v. Durbin–Durco, Inc.,* 377 S.W.2d 343, 348 (no latent defect in load binder without safety ratchet to experienced worker); *Kerber v. Am. Mach. & Foundry Co.,* 300 F.Supp. 1205, 1206 (W.D.Mo.1968), aff'd, 411 F.2d 419 (8th Cir.1969) (applying Missouri law) (danger of visible gears in bun-making machine was open and obvious danger to experienced baker); *Morrison v. Kubota Tractor Corp.,* 891 S.W.2d 422, 428 (Mo.App. W.D. 1994) (visibly absent roll-over protection device on tractor operated by experienced farmer deemed open and obvious as a matter of law); *see also, Winn ex rel. Winn v. Pollard,* 62 S.W.3d 611, 617–18 (Mo.App. W.D.2001).

As to the applicability of the open and obvious doctrine in a negligent failure to warn claim, B & W and PM USA rely on *Young v. Wadsworth,* 916 S.W.2d 877 (Mo. App. E.D.1996). In *Young,* the estate of a driver who was killed in a car accident, along with her injured passengers, sued a physician for failure to warn his patient who suffered from blackouts not to drive a car. *Id.* at 878. Upon leaving the physician's office, the patient blacked out and crashed into the plaintiffs' car. *Id.* The court based its decision that "[t]here is no duty or need to warn of dangers which are

---

**14.** The dissent argued that the claim should have been allowed because the possibility of a runaway car was reasonably foreseeable, and it should be for a jury to decide the reason-

ableness of the driver's actions, and apportion liability under the concept of comparative fault. *Harris,* 857 S.W.2d at 228–30.

open and obvious or which are commonly known[,]" on the facts that the patient had two previous blackout episodes and knew he was subject to blackouts when he drove his car, and, thus, the physician had no duty to warn the patient of that which he already knew. *Id.* Although the term "common sense" was used with regard to whether a driver should know he or she should not drive if subject to blackouts, the facts of the case showed that the patient had actual knowledge of the specific danger of blacking out. *Id.*

■ Our review of the law in Missouri as to the open and obvious exception to the duty to warn in a negligence claim, therefore, generally requires either a visibly observable open and obvious danger, or that the injured party had actual knowledge of the specific danger. In a case, as before us, where the danger was not visibly observable, we must determine what standards and burden of proof apply in deciding whether the plaintiff had sufficient knowledge of the danger as to obviate the duty to warn.

### D. Deciphering Other Missouri Failure to Warn Cases with Elements of Negligence and Strict Liability

Other Missouri failure to warn cases addressing the plaintiff's knowledge are difficult to analyze with regard to applicable legal standards and burden of proof, because many are brought as multiple claims of both strict tort liability and negligence. In many of these decisions, only the strict liability claim is contested and examined on appeal. As previously noted, the law in Missouri relating to strict tort liability claims has been defined by statute, but we analyze cases decided prior to adoption of the statute to determine whether the legal reasoning employed applies equally to negligence claims. Appellate decisions deciding strict tort liability

claims, prior to the adoption of section 537.765, have relied on prior decisions, as well as sections of the Restatement of Torts, applicable to negligence claims. One such case is *Duke v. Gulf & Western Manufacturing Co.*, 660 S.W.2d 404 (Mo. App. W.D.1983), which was relied upon by Michael Thompson in support of his contention that the adequacy of his knowledge, such as to obviate B & W and PM USA's duty to warn, is a question for the jury.

In *Duke*, a power press operator sued the manufacturer of the machine for strict product liability and negligence after his hands were injured when he fell into the press. *Id.* at 407. The plaintiff alleged that the press was defectively designed, was unreasonably dangerous due to a lack of safety guards, and that the manufacturer failed to warn of the dangers of operating the press as designed. *Id.* The opinion discusses causation, design alternatives, substantial alteration, and duty to install safety guards in reference to strict tort liability. *Id.* at 409–18. In evaluating the failure to warn claim, the court acknowledged the differences in a negligent failure to warn claim and a strict liability failure to warn claim. *Id.* at 418. The court said: "[W]hen the defense is raised that the injured plaintiff had adequate knowledge of the risks so as to obviate the duty to warn, the question of the adequacy of the knowledge is a question for the jury." *Id.* In doing so, the court relied on *Fabian v. E.W. Bliss Co.*, 582 F.2d 1257 (10th Cir. 1978), which discusses both section 388 and section 402A of the Restatement of Torts.

The court also held that it is not enough that the injured party had a general awareness of a danger, but a defendant must show that the plaintiff had knowledge "of the *specific danger* arising out of the precise defects asserted." *Id.* (emphasis in original). The court relied on the

strict liability case, *Pust v. Union Supply Co.*, 38 Colo.App. 435, 561 P.2d 355 (1976), aff'd, 196 Colo. 162, 583 P.2d 276 (1978), which held that open and obvious danger is not a defense to strict liability because the mere fact that a danger is open and obvious does not prevent it from being unreasonably dangerous.

The *Duke* court went on to say, in the oft repeated quote, that "no duty exists to warn of common dangers, 'for no one needs notice of what he already knows or reasonably may be expected to know.'" *Id.* The *Duke* court was quoting the language of a motion for rehearing appended to the main opinion of *La Plant v. E.I. Du Pont De Nemours & Co.*, 346 S.W.2d 231, 245 (Mo.App.1961), which sustained the holding in that negligence case.

The main opinion in *La Plant,* although decided nearly 45 years ago, and prior to the adoption of strict tort liability and comparative negligence in Missouri, is instructive as to whether the issue of knowledge is one for the jury. In *La Plant,* a farmer sued a chemical company for negligent manufacture and labeling of a chemical weed killer sprayed on willows, which his cows consumed, causing their deaths. 346 S.W.2d at 234. In appealing the jury verdict in favor of the farmer, the chemical company contended that the farmer failed to make a submissible case of negligence because the weed killer was neither inherently dangerous because a cow could eat the poison directly and not be injured, nor latently dangerous because its patent effect was to kill foliage. *Id.* at 238. As to the inherent danger, the court said that "a product, not at all times inherently dangerous within the quoted definition, may become so in its use for an intended purpose" and that a manufacturer has a duty to

warn of foreseeable and latent dangers. *Id.* at 238–39. "[M]ost duties, imposed by the law of torts, arise out of circumstances and are based on 'foreseeability' or reasonable anticipation that harm or injury is a likely result of acts or omissions." *Id.* at 239 (internal quotation marks omitted). The court further defined a latent danger as one that "is hidden, concealed, not visible or apparent," and that there was no evidence in the record that the farmer knew or should have known that the sprayed weed killer would cause the foliage to become dangerous to his grazing cattle. *Id.* at 240.

■ The court held that, while not unlimited, the borders within which jurors are permitted to find foreseeability "are exceedingly broad and flexible in this jurisdiction." *Id.* at 241. The court reiterated the standard that "[i]f there is some probability of harm sufficiently serious that ordinary men would take precautions to avoid it, then failure so to do is negligence." *Id.* In finding that the trial court did not err in failing to direct a verdict for the chemical company, the *La Plant* court said that unless the facts are so strongly against the plaintiff "as to leave no room for reasonable minds to differ," it was for the jury to decide whether the chemical company's labeling of the weed killer as "not hazardous to livestock" was misleading sufficient to constitute negligence. *Id.* at 241–42. The court further said: "An assurance of safety, as well as a failure to warn of danger, may be negligence. . . . Whether or not the words constituting assurance amount to a warranty, or to a fraud, they will amount to negligence if they unreasonably involve the chance of harm from the danger they conceal."[15] *Id.* The standard, therefore, to

---

**15.** Similarly, comment o of the Restatement (Second) of Torts § 388 (1965), states:

Under the rule stated in this Section one who supplies a chattel to a third person for use is subject to the liability stated in this

take an issue away from the jury's consideration is whether the facts are so strongly against the plaintiff "as to leave no room for reasonable minds to differ."

We find that cases analyzing the application of the open and obvious exception to the duty to warn in a negligence claim support the determination that if the danger is not visibly apparent, the plaintiff must have actual knowledge of the specific danger such that no reasonable person in the same situation would assume that risk. We agree with the holding in *Duke*, that the question of the adequacy of the plaintiff's knowledge of the risk, sufficient as to obviate the defendant's duty to warn, is a question for the jury.

The question before us, then, is whether the facts of this case do not allow reasonable minds to differ that Michael Thompson had knowledge sufficient to make him aware of the danger that the cigarettes he smoked which were manufactured by B & W and PM USA contained nicotine and carcinogens and that they posed a risk of addiction and developing laryngeal cancer, such that he could have taken precautions to avoid the danger. If not, the case is for the jury to assess fault under the comparative fault doctrine.

### E. Is the Evidence of Common Knowledge of the Dangers of Smoking so Strong as to Take the Issue Away From the Jury's Consideration?

Although not directly stated, B & W and PM USA seemingly ask us to take judicial notice of the fact that the dangers of smoking are so commonly known that Michael Thompson's claim should be precluded. In applying the doctrine of judicial notice, "either as a rule of

evidence or as an instrument of judicial reasoning," we are subject to well recognized limits, the most basic condition of which is "the notoriety of the fact to be noticed." *English v. Old Am. Ins. Co.*, 426 S.W.2d 33, 40–41 (Mo.1968).

It must be part of the common knowledge of every person of ordinary understanding and intelligence; only then does it become proper to assume the existence of that fact without proof. It follows, therefore, that judicial notice must be exercised cautiously, and if there is doubt as to the notoriety of such fact, judicial recognition of it must be declined.

*Id.* at 41. In this instance, it is not whether the public recognized a generalized health risk from smoking cigarettes, but whether it was widely known that cigarettes contained addictive nicotine and carcinogens which caused laryngeal cancer.

Dr. Donald Critchlow, a professor of history at St. Louis University, testified for B & W and PM USA on the topic of what knowledge about the risks of cigarette smoking was available to the public in general that might form a basis for "common knowledge." He testified that "common knowledge is public awareness within a culture or society by people of any number of things," but that "there could be common knowledge of things which is shared but not everybody believes it." He further testified that the sources of common knowledge include information acquired through family, the school system, government, media, church, health organizations and popular culture.

Although he discussed the reporting of medical studies in the 1950's and 1960's in

Section if he fails to exercise reasonable care to inform those for whose use the chattel is supplied of its dangerous condition. It follows that the supplier is equally liable if he

actually conceals a defect in the chattel by painting it over or by a pretense of repair, or if by express words he represents it to be safe, knowing that it is not so.

popular magazines and newspapers regarding some of the health effects of smoking, as well as the reporting of the U.S. Surgeon General's Report in 1964 about the dangers of cancer related to smoking, he also admitted that in 1964, at the time Thompson began to smoke, 75% of American males smoked. He also acknowledged that cigarette advertising had not yet been banned from television, and that cigarette advertising appeared every 15 minutes. He further agreed that in the 1989 Surgeon General's Report which studied whether or not messages regarding the health risks of smoking were getting through to the American people, that there are three levels of information processing: awareness of information, general acceptance of information, and personalized acceptance of the information. He testified that he did not know what Thompson's personal knowledge was.

Dr. Critchlow also acknowledged that the 1975 Surgeon General's Report examining the attitudes of teenagers found that a majority of them believed that the dangers of smoking were exaggerated, that 47% of the teenagers who smoked did not believe that they would get hurt by it, and that as late as 1979, 60% of teenagers agreed that it was acceptable for teenagers to experiment with cigarettes if they quit before it became a habit, indicating a lack of knowledge about the addictiveness of cigarettes. He further acknowledged that the 1989 Surgeon General's Report found that in 1986, 24% of smokers were not at all concerned about the health effects of smoking, and the report indicated a concern that despite significant gains in public knowledge, that between 8 and 15 million smokers were unaware of or did not accept the important health risks of smoking.

As previously noted, Dr. David Burns, a professor of medicine and an author of the United States Surgeon General's reports on tobacco use and nicotine addiction, testified that Philip Morris knew as early as 1961 that carcinogenic compounds were a component of tobacco smoke. He testified that although the Surgeon General's Report of 1964 indicated that "cigarette smoking is a significant factor in the causation of cancer of the larynx," there were no warning labels on cigarette packages indicating such, and that cigarette companies "consistently denied" that cigarette smoking caused any kind of disease. He further testified that public health literature reported as far back as 1967 that 90% of people diagnosed with laryngeal cancer were cigarette smokers, but that the general public was generally less familiar with the fact that smoking causes laryngeal cancer than with knowledge that smoking causes lung cancer. He testified that it was not until 1999 or later, after Michael Thompson was diagnosed, that tobacco companies acknowledged a link between smoking and laryngeal cancer.

As noted in the prior point, Dr. Burns also testified that Philip Morris marketed "light" cigarettes as less harmful, even though it was aware from its own research that people smoked the cigarettes differently to compensate for the lower tar and nicotine, and effectively got the same amount as with regular cigarettes. Dr. Burns opined that "light" cigarettes carry the same health risks as regular cigarettes and that "light" cigarette design is misleading as being safer. He also testified that the tobacco industry has "consistently denied that nicotine played a role in the addiction of cigarette smoking[,]" but that the main reason people continue to smoke and risk exposure to carcinogens is addiction to nicotine, which impairs their ability to make a free choice about smoking.

In the deposition testimony of Geoffrey Bible, chief executive officer of the Philip Morris companies, Bible testified that in

spite of the agreement of major scientific health organizations like the World Health Organization, the American Medical Association, and American Cancer Society that smoking causes diseases, Philip Morris has never publicly said that smoking causes disease. Bible also testified that he was aware that tobacco smoke contains carcinogens, but that Philip Morris had never made a public statement or advertisement that there were carcinogens in their cigarettes.

Thompson testified on direct examination and again on redirect examination that at the time he started smoking, cigarette packs did not contain any warnings that cigarettes contained nicotine or that it was addictive. Thompson also testified that the packages contained no warnings that cigarettes contained carcinogens or that smoking cigarettes could cause "voice box cancer." If such warnings had been included on cigarette packages between 1964 and 1969, Thompson testified, he would not have become "a confirmed Marlboro smoker." He also testified that nothing in the magazine ads or television ads for Marlboro cigarettes that he saw from 1964 to 1969 contained any warnings that cigarettes contained nicotine or carcinogens. Thompson testified that he did not know that nicotine was addictive and could cause "voice box" (laryngeal) cancer during the entire time he smoked, or that the symptoms he experienced during attempts to quit smoking, which included feeling "stressed out, anger, on edge," were the effects of withdrawal of nicotine on the body.

Examining this evidence, we find that reasonable minds could differ as to whether public knowledge about the health risks of developing laryngeal cancer and nicotine addiction from smoking cigarettes was so

certain and generally known that B & W and PM USA had no duty to warn Thompson of the dangers. Thus, the case was for the jury to decide.

We are further persuaded in our decision by our review of the decisions of courts in other jurisdictions, which show that there is no consensus on the issue of common knowledge of the dangers of smoking. The decisions range from courts taking judicial notice of the common knowledge of the dangers of smoking since 1964, (*Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F.Supp.2d 263, 274 (D.R.I.2000)), to courts differentiating the general health risks of smoking from the risk of addiction to nicotine in cigarettes and finding that such is a jury question, (*Insolia v. Philip Morris Inc.*, 216 F.3d 596, 603 (7th Cir. 2000)), to a refusal to give judicial recognition to something as intangible as public knowledge more than three decades prior (*Hill v. R.J. Reynolds Tobacco Co.*, 44 F.Supp.2d 837, 844 (W.D.Ky.1999)). We agree with the court in *Wright v. Brooke Group Ltd.*, 114 F.Supp.2d 797, 817 (N.D.Iowa 2000), which said: "[t]he simple fact that courts disagree about whether or not to take judicial notice of this fact further illustrates to this court that this fact is subject to considerable dispute, such that taking judicial notice of it would be improper."[16] The second point is denied.

### III. Negligent Failure to Warn Against PM USA

In a point related to the second, PM USA contends that the trial court erred in denying their motion for judgment notwithstanding the verdict on that part of the negligence claim against PM USA for failure to warn of the dangers of smoking prior to 1969. Michael Thompson

---

16. For an excellent survey discussion of the range of court opinions on the common knowledge doctrine across different jurisdictions, see *Wright*, 114 F.Supp.2d at 810–18.

started smoking Marlboro cigarettes manufactured by PM USA in 1963, prior to the time the federal government began requiring certain warning labels on cigarette packages and limited failure to warn claims against cigarette manufacturers in 1969 under the FCLAA. Thus, this claim pertained only to PM USA and not B & W whose cigarettes he did not smoke until after 1992. Specifically, PM USA contends that Thompson failed to make a submissible case because he did not prove that he would have stopped smoking had he been given a proper warning.

 In Missouri, a plaintiff may choose to bring a failure to warn case under a negligence theory pursuant to Section 388 of the Restatement (Second) of Torts, *Morris v. Shell Oil Co.*, 467 S.W.2d 39 (Mo.1971), or as an action for strict liability pursuant to Section 402A of the Restatement (Second) of Torts, *Duke v. Gulf & W. Mfg. Co.*, 660 S.W.2d 404 (Mo. App. W.D.1983). *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 383 (Mo. 1986). The defendant's standard of care, knowledge and fault are relevant considerations in a negligence claim, but under strict tort liability, the defendant may be found liable without regard to his knowledge or conduct. *Id.* Michael Thompson brought both types of claims against PM USA for personal injury based on the ground of strict liability failure to warn and the separate negligence claim. The jury found in favor of PM USA on the strict liability failure to warn claim.

As noted in the prior point, in a negligence claim, "Missouri has long recognized that a manufacturer has the duty to warn ultimate users of its products or articles which are inherently dangerous or are dangerous because of the use to which they are put." *Hill v. Gen. Motors Corp.*, 637 S.W.2d 382, 384 (Mo.App. E.D.1982) (citations omitted). A supplier has a duty to warn of foreseeable and latent dangers related to the proper and intended use of the chattel or product. *Id.* at 385.

 In discussing the role of contributory negligence in a negligent failure to warn case, the Missouri Supreme Court has said:

We have already held that it was for the jury to say here whether plaintiff was negligent or not. Defendant argues that no causal connection was shown between its alleged negligence and the injury; that if plaintiff paid no more attention than he did to these directions, he would not have paid any more to better ones. It would be pure speculation for us to so hold.

*Bean v. Ross Mfg. Co.*, 344 S.W.2d 18, 28 (Mo. banc 1961). The case is one for the jury to decide, "so long as a reasonable probability appears that he would have heeded a different and more adequate warning." *Id.*

 PM USA urges us to follow the requirements of a failure to warn claim as enunciated in *Arnold v. Ingersoll–Rand Co.*, 834 S.W.2d 192, 194 (Mo. banc 1992). For a plaintiff to establish causation in a strict liability failure to warn claim, the plaintiff must show that his injuries were "caused by the product from which the warning is missing" and that "a warning would have altered the behavior of the individuals involved in the accident." *Id.* at 194. "If there is sufficient evidence from which a jury could find that the plaintiff did not already know the danger, there is a presumption that a warning will be heeded." *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 14 (Mo. banc 1994). "[W]hen the defense is raised that the injured plaintiff had adequate knowledge of the risks so as to obviate the duty to warn, the question of the adequacy of the knowledge is a question for the jury."

*Duke v. Gulf & W. Mfg. Co.*, 660 S.W.2d 404, 418 (Mo.App. W.D.1983). In explaining this aspect of *Duke*, the Missouri Supreme Court in *Arnold* said:

> Thus, a preliminary inquiry before applying the presumption is whether adequate information is available *absent* a warning. In *Duke*, the court of appeals proceeded to recognize a presumption that a warning would be heeded only after finding that there was a legitimate jury question whether the plaintiff did not already know the danger. *Duke*, 660 S.W.2d at 418–19. As causation is a required element of the plaintiffs' case, the burden is on plaintiffs to show that lack of knowledge.

*Arnold*, 834 S.W.2d at 194 (emphasis in original).

Applied to the facts in this case, in the prior point, we have already concluded that Michael Thompson did not have knowledge of the specific danger confronting him, and accordingly, he is entitled to the presumption. As delineated in the second point, Michael Thompson presented evidence that, prior to 1969, there were no labels on cigarettes warning of the dangers of *addictive nicotine or carcinogens that could cause laryngeal cancer*. Michael Thompson testified that he was not aware of these dangers and would not have become a "confirmed Marlboro smoker" if he had these specific warnings. The issue of whether an adequate warning would have altered Michael Thompson's behavior was properly submitted to the jury. The third point is denied.

### IV. Insufficient Evidence of Causation in Negligent Product Defect Claim Against B & W

In the fourth point on appeal, B & W alone contends that the trial court erred in denying its motion for judgment notwithstanding the verdict in that Michael Thompson failed to make a submissible case on his claims against B & W on the negligence and product defect claims because he presented insufficient evidence that GPC cigarettes, manufactured by B & W, caused his laryngeal cancer. Specifically, B & W contends that because Michael Thompson only smoked GPC cigarettes for the last five years of his 30-plus-year smoking history, and that the treating physician testified that the typical latency period for laryngeal cancer is 15 to 20 years, his cancer developed prior to the time he began smoking GPC cigarettes and could not have been caused by its product.

B & W contends that neither of Michael Thompson's experts testified to a reasonable degree of medical certainty that Michael Thompson's cancer was caused by smoking GPC cigarettes and, therefore, he failed to make a submissible case under the "but for" causation test. Michael Thompson contends that his experts did unequivocally testify that smoking GPC cigarettes contributed to his development of cancer. B & W does not contend in this point that the jury instruction on causation given pursuant to MAI 19.01 was improper.

In discussing the applicability of the "but for" test, the Missouri Supreme Court said that it "is the minimum causation because it merely proves that defendant's conduct is causally connected to the plaintiff's injury." *Harvey v. Washington*, 95 S.W.3d 93, 96 (Mo. banc 2003) (citing *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862 (Mo. banc 1993)). " 'Two causes that combine' can constitute 'but for' causation." *Id.*

The general rule is that if a defendant is negligent and his [or her] negligence combines with that of another, or with any other independent, intervening cause, he [or she] is liable, although his

[or her] negligence was not the sole negligence or the sole proximate cause, and although his [or her] negligence, without such other independent, intervening cause, would not have produced the injury.

*Id.* (quoting *Carlson v. K–Mart Corp.,* 979 S.W.2d 145, 147 (Mo. banc 1998)). "To make a prima facie showing of causation, the plaintiff must show the defendant's negligent conduct more probably than not was a cause of the injury. The defendant's negligence need not be the sole cause of the plaintiff's injury, but simply a cause or a contributing cause." *Nisbet v. Bucher,* 949 S.W.2d 111, 115 (Mo.App. E.D.1997) (internal citation omitted).

Noting that "[t]he debate as to whether and when Missouri requires 'but for' causation has arisen almost exclusively in the sufficiency of evidence cases such as this one[,]" the *Callahan* court said:

All of this discussion concerning the semantics of causation is less important in Missouri than in most jurisdictions because under MAI we do not use the terms 1) "proximate cause," 2) "but for causation," or 3) "substantial factor" when instructing the jury. We merely instruct the jury that the defendant's conduct must "directly cause" or "directly contribute to cause" plaintiff's injury. *See MAI 19.01 [1986 Revision] Verdict Directing Modification—Multiple Causes of Damage.*

863 S.W.2d at 863.

B & W argues that Michael Thompson's experts did not testify "to a reasonable degree of certainty" that GPC cigarettes specifically caused Michael Thompson's cancer and, therefore, he failed to make a submissible case. There exists support for the proposition in tort cases that "[w]hen a party relies on expert testimony to provide evidence as to causation when there are two or more possible causes, that testimony must be given to a reasonable degree of certainty." *Abbott v. Haga,* 77 S.W.3d 728, 732 (Mo.App. S.D.2002) (quoting *Tompkins v. Cervantes,* 917 S.W.2d 186, 189 (Mo.App.1996)). "Although it may be arguable as to whether the exact phraseology of 'reasonable degree of certainty' is necessary, language that is equivocal will not rise to the level necessary for consideration of the evidence by the trier of fact." *Id.* It is insufficient when "an expert merely testifies that a given action or failure to act 'might' or 'could have' yielded a given result, though other causes are possible." *Id.* (quoting *Tompkins,* 917 S.W.2d at 189).

On direct examination, Dr. Girod, Michael Thompson's treating physician, who is a head and neck surgeon, testified to a "reasonable degree of medical certainty" that Michael Thompson's cancer was "caused by his history of smoking." He further testified to a "reasonable degree of scientific certainty" that in comparing Michael Thompson's use of alcohol with his 30–year "very extensive exposure to tobacco" that smoking was the primary cause of his laryngeal cancer. Clearly, Dr. Girod testified, according to the required expert testimony standard, that Michael Thompson's entire smoking history, encompassing both the time he smoked Marlboros and the time he smoked GPC cigarettes, caused his laryngeal cancer. Our review of the transcript finds nothing equivocable in Dr. Girod's opinions that Michael Thompson's entire smoking history caused his cancer.

With regard to GPC cigarettes in particular and whether the length of smoking each type of cigarette could be assessed a percentage of contribution to the development of Michael Thompson's cancer, on redirect examination by Michael Thompson's counsel, Dr. Girod testified:

Q: Doctor, do you believe that the GPC [cigarettes,] given the assumption here [that Thompson smoked Marlboros for 52 pack years and GPC for 14 pack years,] had a role to play in causation in this case?

A: Yes, I believe it would given this model. The cancer occurred some seven years after the change and as we have seen cessation of exposure had stopped in 1990 would have possibly not resulted in cancer but might have, but certainly with continued exposure, continued insult for another seven years is where we did end up with cancer.

Viewed in the light most favorable to the verdict, Dr. Girod testified that if Michael Thompson had stopped smoking in 1990 he might have avoided developing cancer, but with his continued smoking for the next seven years, most of which was smoking GPC cigarettes, he developed cancer.

B & W further contends that the following exchange indicates that there was no causal link between Michael Thompson's smoking GPC cigarettes and the development of his cancer.

Q: Doctor, would you describe what you think the relationship is here, between these two smoking histories and his cancer?

A: I don't believe you could say for sure that one was more responsible than the other.

Again, taken in the light most favorable to the verdict, Dr. Girod did not exonerate GPC cigarettes in his opinion, but stated that both types of cigarettes were equally responsible for Michael Thompson's cancer.

B & W also contends that the following exchange is insufficient evidence as to causation that GPC cigarettes caused or directly contributed to cause Michael Thompson's cancer. On recross-examina-

tion by counsel for B & W, Dr. Girod testified:

Q: So you don't know over specifically what period of time or how many pack years he actually smoked GPC before he developed laryngeal cancer, do you?

A: No, I do not.

Q: As a result, because you do not know, you cannot give a medical opinion to a reasonable degree of medical certainty that GPC directly caused or directly contributed to cause his laryngeal cancer, correct? You would need more information?

A: No, I would disagree with that.

Clearly, Dr. Girod disagreed with the contention that he could not give a medical opinion to a reasonable degree of medical certainty that GPC cigarettes caused or contributed to cause Michael Thompson's cancer. Merely because counsel immediately thereafter changed the line of questioning to prevent Dr. Girod from uttering the "magic" words from his own mouth that "to a reasonable degree of medical certainty that GPC directly caused or contributed to cause [Michael Thompson's] laryngeal cancer" does not mean that the inference was insufficient for the jury's consideration.

Finally, B & W contends that because Michael Thompson's expert witnesses testified that laryngeal cancer has a typical 15- to 20-year latency period, which is the time between the start of smoking and the beginning of the development of cancer, and because Michael Thompson smoked Marlboro cigarettes for more than 20 years prior to smoking GPC cigarettes, that this testimony negated the "speculative inference" that GPC cigarettes caused his cancer. They contend that this means that "Thompson's cancer began to develop long before he smoked his first GPC ciga-

rettes and could *not* have been caused by his smoking GPC cigarettes thereafter." (Emphasis in original.)

Dr. Girod testified that the general range of a latency period for cancer of the type Michael Thompson developed is 15 to 20 years, but "every person is different . . . [and] there is a broad spectrum." He further testified that the latency period can be much longer than 20 years. We simply find no support for B & W's argument as to this point.

Viewed in the light most favorable to the verdict, this testimony, taken on the whole, was sufficient to establish causation under Missouri law that Michael Thompson's smoking GPC cigarettes caused or contributed to cause his cancer and was properly submitted to the jury for their consideration. The fourth point is denied.[17]

## V. Loss of Consortium Claim and the Relation Back Doctrine

■ In their fifth point, B & W and PM USA contend that the trial court erred in denying their motion for judgment notwithstanding the verdict on Christi Thompson's claim for loss of consortium on two grounds. The first is that if we find that Michael Thompson's claims fail on submissibility issues, then Christi Thompson's claim also fails because a loss of consortium claim is derivative of the spouse's underlying tort claim. They also contend that because Christi Thompson's loss of consortium claim was added by amended pleading after the five-year statute of limitations on a tort action, her

claim is a separate claim and is time-barred. The Thompsons contend that because a loss of consortium claim is derivative, the addition of Christi Thompson's claim relates back to the filing of Michael Thompson's original petition.

Because B & W and PM USA's original tenth point is related to the loss of consortium claim, we also consider it here. In that point, B & W and PM USA contend that the trial court erred in denying their request for a jury instruction regarding a finding of the date of accrual of Christi Thompson's loss of consortium claim and whether it was time-barred. They contend that failure to offer the instruction entitles them to a new trial on the issue.

■ Whether a statute of limitations has run to bar a claim is normally a question of law for the circuit court's decision. *Straub v. Tull*, 128 S.W.3d 157, 159 (Mo. App. S.D.2004). We review questions of law de novo, giving no deference to the circuit court's determination of law. *Id.* "However, when contradictory or different conclusions may be drawn from the evidence as to whether the statute of limitations has run, it is a question of fact for the jury to decide." *Lomax v. Sewell*, 1 S.W.3d 548, 552–53 (Mo.App. W.D.1999).

Michael Thompson was diagnosed with laryngeal cancer on February 4, 1997, and had his first cancer surgery on February 11, 1997. On August 23, 2000, Michael Thompson sued B & W and PM USA, seeking compensatory and punitive damages for negligence, failure to warn and

---

17. Although B & W also alleged error in this point for the circuit court's denial of their motion for JNOV relating to insufficient evidence to make a submissible case regarding the product defect claims, they failed to properly support their argument, and thus we are not obligated to review it. *Thummel v. King*, 570 S.W.2d 679, 687 (Mo. banc 1978). We note, however, that Dr. Burns testified with

regard to the defectiveness of GPC cigarettes and provided competent testimony on this point.

Q: Doctor, do you believe within a reasonable degree of medical certainty whether GPC cigarettes are defective and unreasonably dangerous?

A: Yes, I believe they are defective and unreasonably dangerous.

strict liability for product defect, well within the five-year window for bringing a personal injury action. § 516.120, RSMo 2000. On June 3, 2002, he filed an amended petition seeking to add claims of conspiracy and concealment, and to add his wife, Christi Thompson, to the lawsuit, so that she could bring a loss of consortium claim related to his injury claims. The record does not reflect that B & W and PM USA objected to the amended petition at that time.

B & W and PM USA did not file answers to the Thompsons' amended petition until the start of trial on October 6, 2003, more than a year after the consortium claim was added. In those answers, B & W contended in its third affirmative defense that Christi Thompson's loss of consortium claim was time-barred, and PM USA contended in its second affirmative defense that all of the Thompsons' claims were time-barred. Also on October 6, 2003, B & W and PM USA filed a motion for summary judgment on the loss of consortium claim, which argued that the loss of consortium claim was time-barred or, in the alternative, that the date of accrual of Christi Thompson's claim was a question of fact for the jury. That motion was overruled by the trial court on October 14, 2003, without a written opinion.

On October 16, 2003, B & W and PM USA offered a proposed jury instruction directing a verdict for the defendants on the loss of consortium claim if "Christi Thompson knew or by using ordinary care could have known before June 3, 1997, that she had sustained damage as a direct result of her husband's cancer." That instruction was refused. At the close of trial, B & W and PM USA moved for a directed verdict, which was overruled on November 3, 2003. The next day the jury returned a verdict in favor of Michael Thompson on two of his claims, and in

favor of Christi Thompson on her claim of loss of consortium. On December 11, 2003, B & W and PM USA moved for a judgment notwithstanding the verdict or, alternatively, motion for a new trial, on the grounds that either Christi Thompson's claim was time-barred, or that the date of accrual of the cause of action was in dispute and, therefore, a jury question. That motion was also denied, without written comment on the loss of consortium issue.

Because we have no written opinion to guide us, we presume that the trial court decided, by its refusal to offer the jury instruction, that the issue of whether the loss of consortium claim was time-barred was a question of law. The question before us is twofold: (1) if the loss of consortium claim was filed later than the five-year statute of limitations for personal injury actions, did the filing as an amended petition "relate back" to the date of the injured spouse's petition, and (2) if not, was the date of accrual of the loss of consortium claim a question of fact which should have been submitted to the jury for their determination? The first of these questions has never been directly addressed in Missouri and is, therefore, an issue of first impression.

A spouse's right to sue for loss of consortium was recognized by the Missouri Supreme Court in *Novak v. Kansas City Transit, Inc.*, 365 S.W.2d 539, 543 (Mo. banc 1963). "A consortium claim is a separate, distinct, and personal legal claim, and is derivative only in the sense that it must be occasioned by a spouse's injury." *Burke v. L & J Food & Liquor, Inc.*, 945 S.W.2d 662, 664 (Mo.App. W.D.1997).

When a married person is injured, two causes of action arise: one accrues to the injured person for the injuries suffered directly by him or her, and the other accrues to the injured person's spouse for damages suffered as a result

of the loss of the injured person's services, society, companionship, and sexual relations (loss of consortium).

*O'Neal v. Agee,* 8 S.W.3d 238, 242 (Mo. App. E.D.1999). The latter claim for loss of consortium is derivative only; for one spouse to recover for loss of consortium, the other spouse must have a valid claim for personal injury. *Richardson v. State Highway & Transp. Comm'n,* 863 S.W.2d 876, 880 (Mo. banc 1993) (citing *Huff v. Trowbridge,* 439 S.W.2d 493, 498 (Mo. 1969)).

▆▆▆▆ Settlement of the underlying personal injury claim by the injured spouse does not preclude the other spouse from maintaining an action for loss of consortium against the tortfeasors in a separate suit. *Shepherd v. Consumers Co-op. Ass'n,* 384 S.W.2d 635, 640 (Mo.1964); *see also, Burke,* 945 S.W.2d at 664. However, the spouse seeking damages for loss of consortium is not entitled to recover merely because the tortfeasors were found to be liable for damages to the injured spouse. *M.C. v. Yeargin,* 11 S.W.3d 604, 614 (Mo. App. E.D.1999), *abrogated on other grounds by State Bd. of Registration for Healing Arts v. McDonagh,* 123 S.W.3d 146 (Mo. banc 2003). Such damages must be proved. *Id.* Damages are calculated separately from those that may have been awarded to the injured spouse and determined in relation to the unique damage suffered by the loss of consortium. *Stahlheber v. Am. Cyanamid Co.,* 451 S.W.2d 48, 64 (Mo.1970).

▆▆▆▆ Whether the loss of consortium claim is joined with the underlying personal injury action is in part governed by Rule 66.01, which governs the consolidation of cases. Consolidation of loss of consortium claims is addressed in Rule 66.01(d), and states:

> Consolidation—Injury to Spouse. If an injury not resulting in death is inflicted upon the person of one spouse, and causes of action therefor accrue to the injured spouse and also to the other spouse for loss of consortium or services or medical expenses, they shall be enforced in one action by both spouses if they have ever been coparties in such action or if notice is given.
>
> If any party against whom a claim is asserted gives written notice of the pendency of the action and of the necessity to join therein to the spouse whose claim was not joined and to the attorney for the spouse upon whose behalf the lawsuit was filed, the claim of such spouse who has not been joined shall be barred unless the spouse makes application to be added as a party therein within thirty days after such notice. The spouse so required to join shall have an unconditional right to be added as a party pursuant to Rule 52.06.

Interpreting the purpose and function of this rule, the Missouri Supreme Court said: "The intention of the Court at [the time of promulgation] was to *permit* and *encourage* the two spouses to file a single suit to enforce their separate causes of action and, at the election of the defendant, upon giving the prescribed notice, to *require* this procedure." *Cline v. Carthage Crushed Limestone Co.,* 504 S.W.2d 118, 120 (Mo.1974) (emphasis in original). Thus, loss of consortium actions are encouraged to be brought in a single action, but may under certain circumstances be brought separately, and at the election of the defendant, may be required to be brought in the single action.

▆▆▆▆ The applicability of the statute of limitations in loss of consortium claims has been addressed in only a few cases. Generally, the statute of limitations which applies to a loss of consortium claim is that which applies to the underlying tort claim of the injured spouse. *Kamerick v. Dor-*

*man,* 907 S.W.2d 264, 267 (Mo.App. W.D. 1995). In addressing whether a spouse could sue for loss of consortium even though the injured spouse did not pursue a suit against the alleged tortfeasors for her own injuries, this court said that "the failure of one spouse to sue for injuries within the statute of limitations does not bar a suit for loss of consortium that was timely filed." *Maddox v. Truman Med. Ctr., Inc.,* 727 S.W.2d 152, 155 (Mo.App. W.D. 1987). This is because statutes of limitation are a procedural bar rather than a substantive bar and merely bar a remedy, but "do not extinguish the underlying right." *Id.* at 154. "[A] claim for loss of consortium will be barred only when the injured spouse's claim is completely invalid ... [but where] an injured husband's recovery is prevented by a procedural bar unrelated to the merits of his claim, his claim should be viewed as valid, for the purpose of supporting his wife's claim for loss of consortium." *Id.* (citation omitted). The question before us—whether a loss of consortium claim is time-barred when the underlying personal injury action was timely filed—has not been squarely addressed.

▇▇▇ Rule 55.33(a) provides for the amendment of pleadings by leave of the court "and leave shall be freely given when justice so requires." The decision to allow or disallow an amended pleading, is within the sound discretion of the trial court, and is reviewed only for abuse of discretion. *Lester v. Sayles,* 850 S.W.2d 858, 869 (Mo. banc 1993). Factors the circuit court should consider in the exercise of that discretion include:

(1) the hardship to the moving party if leave to amend is denied;

(2) the reasons for the moving party's failure to include the matter in the original pleadings; and

(3) the injustice to the nonmoving party should leave to amend be granted.

*Id.* "Pleadings should not be amended during trial if the party adversely affected will not be afforded a reasonable opportunity to rejoin the allegations of the amended pleading." *Nichols v. Mama Stuffeati's,* 965 S.W.2d 171, 176 (Mo.App. W.D.1997), *overruled on other grounds by Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220 (Mo. banc 2003). "The real test is whether additional proof or additional witnesses for which a party is not prepared would be required to meet the new allegations. . . ." *Id.* (quoting *Wallick v. First State Bank of Farmington,* 532 S.W.2d 520, 523 (Mo. App.1976)).

▇▇▇ "Motions to amend to add or substitute a party should be freely granted when justice so requires." *Asmus v. Capital Region Family Practice,* 115 S.W.3d 427, 432 (Mo.App. W.D.2003). Rule 52.06 provides: "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." "The law in Missouri for nearly a century is a new action is not commenced by substituting the party having the legal right to sue instead of another party improperly named." *Asmus,* 115 S.W.3d at 433–34 (quoting *Union Ctr. Redevelopment Corp. v. Leslie,* 733 S.W.2d 6, 8 (Mo. App.1987)). "This rule is especially true where the subject matter of the suit and the issues to be tried are unchanged. . . ." *Id.* at 434. In determining the propriety of adding a new party plaintiff, this court has said:

[A]s long as defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action against him, his ability to protect himself will not be prejudicially affected if a new plaintiff is added, and he should not be permitted to invoke a limitation

defense. This seems particularly sound inasmuch as the courts will require the scope of the amended pleading to stay within the ambit of the conduct, transaction, or occurrence set forth in the original pleading.

*Id.* (quoting *Rotella v. Joseph,* 615 S.W.2d 616, 624 n. 8 (Mo.App.1981) (citing 6 WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE § 1501, at 523)).

■■■■■ Whether the amended pleading relates back to the date of the original pleading is governed by Rule 55.33(c), which states:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment *changing the party against whom a claim is asserted* relates back if the foregoing provision is satisfied and within the period provided by law for commencing the action against the party and serving notice of the action, the party to be brought in by amendment: (1) has received such notice of the institution of the action as will not prejudice the party in maintaining the party's defense on the merits and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

(Emphasis added.) "When an amended pleading arises 'out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading,' the amended pleading relates back." *Koerper & Co., Inc. v. Unitel Int'l., Inc.,* 739 S.W.2d 705, 706 (Mo. banc 1987). New, additional claims which arise out of the same conduct, transaction, or occurrence may be raised in an amended plead-ing and relate back to the date of the original pleading. *Wells v. Stinson, Mag & Fizzell,* 739 S.W.2d 706, 707 (Mo. banc 1987). Clearly in this case, the evidence supports, and the defendants admit in their point on appeal, that Christi Thompson's loss of consortium claim arises out of the "conduct, transaction, or occurrence" of Michael Thompson's throat cancer and treatment thereof.

Although B & W and PM USA cite this rule in support of their argument that the addition of Christi Thompson's loss of consortium claim as a party plaintiff cannot relate back to the date of Michael Thompson's original claim, clearly, the second sentence of Rule 55.33(c) addresses "changing the party *against* whom a claim is asserted," which means the changing of party defendants. (Emphasis added.) Most of the cases relied upon by the defendants in support of their argument discuss the applicability of Rule 55.33(c) to the addition of party defendants, not party plaintiffs. *See, Windscheffel v. Benoit,* 646 S.W.2d 354, 357 (Mo. banc 1983) (Rule 55.33(c) inapplicable where plaintiff seeks to add a defendant, not change defendant, as rule is "a remedy for a mistake in *identity,* and the remedy is a *change* in party") (emphasis in original); *State ex rel. Hilker v. Sweeney,* 877 S.W.2d 624, 628 (Mo. banc 1994) (" 'relation back' is triggered only by a mistake in identifying a party defendant and not by a mistake in failing to add a party defendant"); *Smith v. Overhead Door Corp. of Texas,* 859 S.W.2d 151, 152 (Mo.App. W.D.1993) (relation back is for the correction of a misnomer or other mistake regarding the identity of the proper defendant).

The addition of party plaintiffs, which is the case before us, is not directly addressed by Rule 55.33(c). B & W and PM USA rely heavily on *Caldwell v. Lester E. Cox Medical Centers–South, Inc.,* 943

S.W.2d 5 (Mo.App. S.D.1997), for the proposition that Rule 55.33(c) does not save an amended petition from the statute of limitations where it seeks to add a party plaintiff. In that case, Caldwell timely filed an action for wrongful death of his son, and after the two-year statute of limitations had run for filing a medical malpractice action, filed an amended petition in his capacity as a plaintiff ad litem to add the claim of lost chance of recovery. *Id.* at 7. The circuit court granted the defendant's motion to dismiss because the statute of limitations had run, and Caldwell appealed, contending that Rule 55.33(c) provided for the amended claim to relate back to the date of the original petition. *Id.* at 7–8. The Southern District noted that an action for lost chance of survival "is a personal injury action which belongs solely to the injured party," and that his capacity as plaintiff ad litem was as a legally separate and distinct individual than that as a claimant in a wrongful death action for his own damage. *Id.* at 8–9 (quoting *Smith v. Tang,* 926 S.W.2d 716, 719 (Mo.App.1996)). Holding that the two-year statute of limitations applicable to a medical malpractice action applied to bar his amended claim, the circuit court said:

> His attempted addition as a party plaintiff is tantamount to the filing of a new claim and Rule 55.33(c) does not authorize an amendment which states an entirely new claim. "An amendment will relate back to the original petition so as to save the action from the statute of limitations only when the original plaintiff had the legal right to sue and stated a cause of action at the time the suit was filed."

*Id.* at 8 (internal citations omitted). We note that at the time of the filing of Caldwell's original petition, the State of Missouri did not yet recognize a cause of action for lost chance of recovery or survival and, more importantly, it was not a

derivative claim. *Id.* at 7. Therefore, we believe this case can be distinguished on its facts. In our case, Christi Thompson's loss of consortium claim is derivative of Michael Thompson's personal injury claim and could not be maintained unless Michael Thompson had a valid, legal right to sue. The factual record supports Michael Thompson's claim.

In describing the intent of Rule 55.33(c), the Missouri Supreme Court said:

> [Rule 55.33(c)] is derived from Rule 15(c) of the Federal Rules of Civil Procedure. This Rule "re-emphasizes and assists in attaining the objective of the rules on pleadings: that pleadings are not an end in themselves, but are only a means to the proper presentation of a case; that at all times they are to assist, not deter, the disposition of litigation on the merits." 3 Moore, Federal Practice, ¶ 15.02, p. 813 (2d Ed.1974). "Rule 15(c) is based on the concept that a party who is notified of litigation concerning a given transaction or occurrence has been given all the notice that statutes of limitation are intended to afford...." 3 Moore, supra, ¶ 15.15[3], at 1025....

*Koerper & Co., Inc. v. Unitel Int'l., Inc.,* 739 S.W.2d 705, 706 (Mo. banc 1987) (citation omitted). The rule is to be liberally applied, and is based on the concept of whether a defendant has been given notice sufficient to defend against claims relating to a particular transaction or occurrence. *Johnson v. GMAC Mtg. Corp.,* 162 S.W.3d 110, 118 (Mo.App. W.D.2005).

In analyzing this case pursuant to the factors the trial court should consider in deciding whether to give effect to the amended petition, we first note that the hardship to Christi Thompson would be severe in that her petition would, in the absence of a fact-based decision on the time of accrual of her claim, have been

time-barred unless related back to the date of filing of Michael Thompson's original petition. As to the second factor, the record does not reflect and the parties have not directed our attention to the reasons that Christi Thompson's claim was not filed earlier. The final consideration is the prejudice to the defendants if the claim is granted. B & W and PM USA have not articulated any prejudice by the amended petition, and we find none in the record. The amended petition was filed nearly 15 months prior to trial; thus, B & W and PM USA had extensive notice to prepare for the claims against them. There is no evidence in the record that B & W and PM USA objected to the amended petition prior to filing their answers to the amended petition at the beginning of trial—the same time they filed a motion for summary judgment on the amended claim. There is no claim that B & W and PM USA were not prepared to defend the loss of consortium claim at trial. We find no prejudice to B & W and PM USA in allowing Christi Thompson's claim of loss of consortium to be litigated in the same suit as Michael Thompson's personal injury suit.

■ Furthermore, the intent of the rules regarding consolidation of loss of consortium claims relates to the economy of judicial resources and the avoidance of the "evil of their piecemeal adjudication." *Dueker v. Eckelkamp*, 180 S.W.3d 17, 19 (Mo.App. E.D.2005). This jury trial lasted from October 3, 2003, until November 4, 2003. The evidence necessary for proof of both claims was regarding the same act, transaction, or occurrence. We, therefore, find that the trial court did not abuse its discretion in allowing Christi Thompson's claim for loss of consortium to proceed along with Michael Thompson's underlying personal injury claim. Because we reach this result, we need not address B & W and PM USA's tenth point regarding the

trial court's refusal to offer a jury instruction regarding the date of accrual of Christi Thompson's claim. These points are denied.

## VI. Comparative Fault Instruction

■ In their sixth point on appeal, B & W and PM USA contend that the trial court erred in instructing the jury on comparative fault, on the plaintiffs' request, because comparative fault is an affirmative defense that B & W and PM USA did not assert in this case. Furthermore, B & W and PM USA contend that they did not try the issue by "implied consent," because evidence introduced by them relating to Michael Thompson's knowledge or conduct was related to rebutting Michael Thompson's case in chief. The Thompsons respond that B & W and PM USA "litigated Michael Thompson's fault at every opportunity," and there was ample evidence in the record to support the giving of an instruction for comparative fault.

We first address the issue of B & W and PM USA's contention that they did not plead the defense of comparative fault in their answers to the Thompsons' first amended petition. The doctrine of comparative fault as codified in Section 537.765, RSMo 2000, which became effective July 1, 1987, states:

1. Contributory fault, as a complete bar to plaintiff's recovery in a products liability claim, is abolished. The doctrine of pure comparative fault shall apply to products liability claims as provided in this section.

2. Defendant may plead and prove the fault of the plaintiff as an affirmative defense. Any fault chargeable to the plaintiff shall diminish proportionately the amount awarded as compensatory damages but shall not bar recovery.

3. For purposes of this section, "**fault**" is limited to:

(1) The failure to use the product as reasonably anticipated by the manufacturer;

(2) Use of the product for a purpose not intended by the manufacturer;

(3) Use of the product with knowledge of a danger involved in such use with reasonable *appreciation* of the consequences and the voluntary and unreasonable exposure to said danger;

(4) Unreasonable failure to appreciate the danger involved in use of the product or the consequences thereof and the unreasonable exposure to said danger;

(5) The failure to undertake the precautions a reasonably careful user of the product would take to protect himself against dangers which *he would* reasonably appreciate under the same or similar circumstances; or

(6) The failure to mitigate damages.

"The subdivisions of subsection 3 of this statute generally constitute the following defenses: (1) unforeseeable misuse; (2) foreseeable misuse; (3) assumption of the risk; (4) negligent assumption of the risk; (5) contributory negligence; and, (6) failure to mitigate damages." *Egelhoff v. Holt,* 875 S.W.2d 543, 548 (Mo. banc 1994).

In its answer to the petition, B & W pled multiple affirmative defenses, which constitute the affirmative defenses related to comparative fault:

Fifth Affirmative Defense: The alleged injuries and damages of Plaintiffs were caused solely by the acts, wrongs, or omissions of Plaintiffs themselves or by preexisting conditions or by intervening or superceding causes or by other persons, entities, forces and/or things over which [B & W] had no control and for which [B & W] is not responsible.

Sixth Affirmative Defense: The negligence, fault, or carelessness of other persons, entities, forces and/or things over which [B & W] had no control, and for which [B & W] is not responsible, proximately caused or contributed to the alleged injuries and damages of Plaintiffs, and, therefore, any recovery of Plaintiffs is barred or must be reduced in proportion to the amount of negligence, fault, or carelessness attributable to such other persons, entities, forces and/or things.

Seventh Affirmative Defense: Plaintiffs' claims are barred by the doctrines of assumption of risk and consent.

Eighth Affirmative Defense: ... [B & W] avers that it cannot be held liable because Plaintiffs were warned of any material risk of injury connected with the foreseeable use of [B & W] products.

Ninth Affirmative Defense: ... [B & W] avers that it cannot be held liable for failure to warn of a material risk associated with the consumption of B & W products because any such risk was or should have been obvious to a reasonably prudent product user or should have been a matter of common knowledge to persons in the same or similar position as Plaintiffs.

Tenth Affirmative Defense: ... [B & W] avers that it cannot be held liable because the characteristics of [B & W's] cigarettes alleged in Plaintiffs' Amended Petition were open and obvious.

Eleventh Affirmative Defense: ... [B & W] avers that it cannot be held liable because Plaintiffs were knowledgeable users of such products and [B & W] complied with the Cigarette Labeling and Advertising Act[.]

Twelfth Affirmative Defense: ... [B & W] avers that it cannot be held liable because even if use of [B & W] products created a[sic] unreasonable risk of personal injury, and even if this risk was the proximate cause of Plaintiffs' alleged injuries, Plaintiffs were aware of and

voluntarily exposed themselves to that risk.

. . . .

Nineteenth Affirmative Defense: [B & W] alternatively avers that Plaintiffs had a duty, but failed, to mitigate any damages they may have suffered, which failure bars or reduces any recovery by the Plaintiffs.

PM USA pled the following affirmative defenses in its answer to the Thompsons' first amended petition:

Seventh Affirmative Defense: Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to mitigate any injuries and damages they allegedly suffered. Specifically, Plaintiff Michael Thompson continued to smoke despite the known dangers of cigarette smoking, and failed to seek employment or vocations and failed to reasonably attempt to rehabilitate himself physically and vocationally.

. . . .

Eighteenth Affirmative Defense: If Plaintiffs were injured or damaged, which alleged injuries and damages are denied, such alleged injuries and damages were caused solely by the acts, wrongs, or omissions of Plaintiffs, by preexisting conditions, or by forces, and/or things over which [PM USA] had no control and for which [PM USA] is not responsible or liable.

Nineteenth Affirmative Defense: If Plaintiffs sustained any injuries or incurred any damages, such injuries and damages, if any, were the result of intervening or superseding [sic] events, factors, occurrences or conditions, which were in no way caused by [PM USA]

and for which [PM USA] is not responsible and liable.

Twentieth Affirmative Defense: Plaintiff's claims are barred, in whole or in part, by the doctrine of assumption of the risk. Plaintiffs have long been aware of the hazards of cigarette smoking. Despite this awareness, Plaintiff Michael Thompson did not quit smoking.

Twenty-first Affirmative Defense: While denying at all times that any cigarettes manufactured by [PM USA] caused or contributed to the injuries and damages alleged in the Petition, [PM USA] avers that Plaintiffs were warned or otherwise made aware of the alleged risks and dangers of cigarette smoking and further, that any such risks and dangers, to the extent they existed, were open, obvious and apparent, commonly known and not beyond those which would have been contemplated by an ordinary consumer of cigarettes. Plaintiffs, therefore, are barred from any recovery on the claims asserted.

On October 7, 2003, at the beginning of trial, prior to jury selection, B & W and PM USA filed with the court a document entitled "Defendants' Notice of Withdrawal of the Affirmative Defense of Comparative Fault." The notice read: "Defendants Philip Morris USA Inc. and Brown and Williamson Tobacco Corporation ('Defendants') hereby withdraw the affirmative defense of comparative fault. Defendants previously asserted the affirmative defense of comparative fault in Defendants' Answers to Plaintiff's Petition and in Defendants' Submission of Proposed Jury Instructions." Prior to jury deliberations, the Thompsons requested a jury instruction on comparative fault. B & W and PM USA objected, but the instruction was given.[18]

---

**18.** The instruction read: In Verdict A, you must assess a percentage of fault to plaintiff, whether or not any defendant was partly at fault, if you believe:

B & W and PM USA contend that the trial court's ruling "permitted plaintiffs to dictate the defenses that the defendants were forced to raise." B & W and PM USA contend that "[f]orcing the affirmative defense of comparative fault on defendants was prejudicial instructional error and requires a new trial." The Thompsons respond that it has been the tactic of cigarette company defendants to "initially assert comparative fault as an affirmative defense, withdraw the affirmative defense at some point close to or during trial, emphasize at trial the fault of the plaintiff and his or her 'choice' to smoke cigarettes, and then insist that the jury not be instructed on comparative fault and decide the case on an 'all or nothing' basis."

In denying B & W and PM USA's motion for a judgment notwithstanding the verdict or, alternatively, motion for a new trial, the trial court addressed this issue and said that where there is evidence, as in this case, that would support instructing the jury on comparative fault, that:

> [B]ecause causation and comparative fault are so closely aligned and related in terms of their concepts that to allow one side or the other to unilaterally determine that the jury is not going to consider comparative fault is just not— it's not within what I consider to be the policy of comparative fault as developed in the State of Missouri so far and it doesn't seem to me to be an appropriate use of that kind of—it becomes as a strategic tool or a tactical tool as opposed to a rule of law.

▋ Our review of whether the jury was properly instructed "is a question of law and is to be determined on the record with little deference given to the trial court's decision." *Rudin v. Parkway Sch. Dist.*, 30 S.W.3d 838, 841 (Mo.App. E.D. 2000) (citing *Kuzuf v. Gebhardt*, 602 S.W.2d 446, 449 (Mo. banc 1980)). "We review the evidence and inferences in a light most favorable to the submission of the instruction." *Id.* (citing *Egelhoff v. Holt*, 875 S.W.2d 543, 548 (Mo.1994)). The giving of a comparative fault instruction must be supported by substantial evidence. *Id.* "We reverse comparative fault instructional errors 'only where the errors are of such a nature that there is substantial potential for prejudicial effect.'" *Id.* (quoting *Baldridge v. Lacks*, 883 S.W.2d 947, 956 (Mo.App. E.D.1994), *superceded on other grounds by Rule 72.01 by Pope v. Pope*, 179 S.W.3d 442 (Mo.App. W.D. 2005)). "An instruction is considered prejudicial where it submits a legal question in an abstract way giving the jury a roving commission to return a verdict without being limited to any issues of fact or law developed in the case." *Citizens Bank of Appleton City v. Schapeler*, 869 S.W.2d 120, 129 (Mo.App. W.D.1993). Although opening and closing statements are not to be considered as evidence at trial, we may consider closing argument in determining whether a contended instructional error had any prejudicial effect. *Rudin*, 30 S.W.3d at 842.

To determine whether the giving of the comparative fault instruction was in error, it is necessary to understand the origins of the comparative fault doctrine. In 1983, the Missouri Supreme Court abolished contributory negligence as a complete bar to a plaintiff's recovery in negligence

---

First, when cigarettes were used, plaintiff knew of the danger as submitted in Instruction Numbers 7 thru 9, 12 and 13 and appreciated the danger of its use, and

Second, plaintiff voluntarily and unreasonably exposed himself to such danger, and

Third, such conduct directly caused or directly contributed to cause any damage plaintiff may have sustained.

cases, and adopted the doctrine of comparative fault as found in the Uniform Comparative Fault Act. *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc 1983). Section 2(a) of the Act states: "In all actions involving fault of more than one party to the action, . . . the court, unless otherwise agreed by all parties, shall instruct the jury to answer special interrogatories [comparative fault instructions] . . . indicating . . . the percentage of the total fault of all of the parties to each claim. . . ." *Id.* at 20–21. Fault is defined in the UCFA to include:

> [A]cts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability. The term also includes breach of warranty, unreasonable assumption of risk not constituting an enforceable express consent, misuse of a product for which the defendant otherwise would be liable, and unreasonable failure to avoid an injury or to mitigate damages. Legal requirements of causal relation apply both to fault as the basis for liability and to contributory fault.

*Love v. Park Lane Med. Ctr.*, 737 S.W.2d 720, 724 (Mo. banc 1987) (quoting UCFA § 1(b); *Gustafson*, 661 S.W.2d at 18). In 1987, the legislature adopted, as delineated above, section 537.765, codifying these concepts.

In *Earll v. Consolidated Aluminum Corp.*, 714 S.W.2d 932 (Mo.App. E.D. 1986), the court addressed whether comparative fault instructions should have been submitted to the jury at the request of the plaintiff, where the defendant had pled the affirmative defense of compara-

tive fault but then chose not to submit any proposed instructions on the affirmative defense of comparative fault or contributory negligence. *Id.* at 935. The court noted: "[T]he concepts underlying the adoption of the doctrine of comparative fault [in *Gustafson*] are directed toward the elimination of the inequities inherent in legal doctrines which irrationally impose total responsibility upon one party for the consequences of the conduct of both parties." *Id.* at 936. The court noted that the application of comparative fault, because its benefits are mutual, "should not be determined by any one party." *Id.* The court said that the determinative factor in deciding whether a comparative fault instruction is appropriate depends on the evidence presented in the case, noting that Rule 70.02(a) requires that "[a]ll instructions . . . shall be given or refused by the court according to the law and the evidence in the case." *Id.*

The court held:

> [I]n a negligence case, where there is evidence from which a jury could find that plaintiff's conduct was a contributing cause of his damages, unless the parties agree otherwise, the case should be submitted to the jury under the instructions and verdict forms approved by the Supreme Court for use in comparative fault cases regardless of whether the defendant submits an affirmative defense instruction or not.

*Id.* at 937.[19]

In support of their argument, B & W and PM USA rely on *Lester v. Sayles*, 850

---

**19.** Ultimately, the court affirmed the decision of the trial court not to submit the comparative fault instruction, because at that time, *Lippard v. Houdaille Industries*, 715 S.W.2d 491 (Mo. banc 1986), held that products liability cases could be submitted to the jury on

an "all or nothing at all basis." *Earll*, 714 S.W.2d at 937. That case was supplanted by the legislature's enactment of section 537.765, RSMo Cum.Supp.1987. *See, Egelhoff*, 875 S.W.2d at 547.

S.W.2d 858 (Mo. banc 1993).[20] In *Lester,* the Missouri Supreme Court considered whether the trial court erred in refusing to allow the defendants in a personal injury negligence action to amend their pleadings on the day of trial to allege the plaintiff's comparative fault, as well as the trial court's refusal to offer a comparative fault instruction to the jury. *Id.* at 865. The defendants contended that Section 2(a) of the Uniform Comparative Fault Act, as expressed in *Gustafson,* which instructs that the court "shall instruct the jury to answer special interrogatories [comparative fault instructions] ... indicating ... the percentage of the total fault of all of the parties," mandated the giving of a comparative fault instruction "if the evidence in a case shows that fault may be attributed to more than one party to the action." *Id.* at 867. While the court said that "[g]enerally, we agree with that interpretation," it said that the UCFA does not speak to the question of whether the instruction must be given regardless of whether comparative fault was actually pled as an affirmative defense. *Id.*

The court recognized the holding in *Earll,* but distinguished it, noting that in the facts of that case, the defendant had actually pled comparative fault as an affirmative defense, and that the case was tried under the assumption that comparative fault applied. *Id.* at 868. The *Lester* court held that "comparative fault instructions may be given only where comparative fault has been raised in the pleadings as an affirmative defense." *Id.* The court went on to hold that the circuit court should have permitted the defendants to amend their pleadings to include the affirmative defense of comparative fault as to the actions of the child plaintiff. *Id.* at

869–70. Here, B & W and PM USA seize upon that language to assert that because they did not plead the affirmative defense of comparative fault, or that they effectively withdrew that issue prior to trial, the plaintiffs are precluded from the apportionment of fault. We think that their analysis of and reliance on this bare statement in *Lester* stops too soon.

Factually in *Lester,* the defendants sought the apportionment of and reduction in their liability where they had not originally pled the affirmative defense of comparative fault and had been denied the opportunity to amend their pleadings to reflect that defense. Here, the defendants did originally plead the affirmative defenses of comparative fault. On the eve of trial, they attempted to withdraw the defense and the jury's consideration of comparative fault and, in essence, attempted to turn the concept of comparative fault from a shield into a sword. The ultimate question to be answered here is, therefore, different than in *Lester:* Can a defendant withdraw an affirmative defense of comparative negligence and prevent the plaintiff from seeking a comparative fault instruction when the evidence presented at trial would support such an instruction?

An affirmative defense is a procedural tool available to defendants which "seeks to defeat or avoid the plaintiff's cause of action, and avers that even if the allegations of the petition are taken as true, the plaintiff cannot prevail because there are additional facts that permit the defendant to avoid the legal responsibility alleged." *Mobley v. Baker,* 72 S.W.3d 251, 257 (Mo.App. W.D.2002) (citing *ITT Commercial Fin. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 383 (Mo. banc 1993)). The purpose of the requirement

---

**20.** B & W and PM USA also relied on cases from jurisdictions outside of Missouri and on unpublished opinions, which we find of little probative value where the answers to the question at hand may be found in Missouri law.

that an affirmative defense needs to be pled pursuant to Rule 55.08 is to give the plaintiff notice and the opportunity to prepare for trial. *Id.* at 258.

■ Comparative fault is a substantive basis of liability. "[A] plaintiff's comparative fault is a defense to defendant's liability just as contributory negligence, prior to *Gustafson,* was a defense to defendant's liability." *Lester,* 850 S.W.2d at 868. Missouri no longer follows the concept of contributory negligence. *See, Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983); *see also,* § 537.765. To permit the defendants in this action to withdraw consideration of comparative fault from the jury in this case would negate the clear intent of the legislature and the courts to enact comparative negligence and would effectively reinstate the concept of contributory negligence.

"It is still no more reasonable to charge the defendant with the plaintiff's share of the consequences of his fault than to charge the plaintiff with the defendant's; and it is no better policy to relieve the negligent plaintiff of all responsibility for his injury than it is to relieve the negligent defendant." *Gustafson,* 661 S.W.2d at 13 (internal quotation marks and citation omitted). We find no support in *Lester* for the proposition that the trier of fact is precluded from considering apportionment of fault where the evidence supports the giving of a comparative fault instruction and the plaintiff so requests. To the contrary, the *Lester* court generally agreed that a comparative fault instruction should be given if the evidence in a case showed fault attributable to more than one party to an action. 850 S.W.2d at 867. *Lester* speaks to the question of what is required of a defendant who wishes to take advantage of the procedural tool of the affirmative defense of comparative fault to reduce

their potential amount of damages. *Id.* at 868.

■ Although a defendant may withdraw an affirmative defense, once the issue of a plaintiff's fault has been injected into the case by substantial evidence, the plaintiff may still request an instruction on comparative fault. *Monteith v. Cundall,* 830 S.W.2d 466, 469 (Mo.App. E.D.1992). "If there is evidence from which a jury could find that plaintiff's conduct was a contributing cause of her damages, parties to a negligence action are entitled to have their case submitted to the jury under comparative fault principles, absent an agreement to the contrary." *Rudin v. Parkway Sch. Dist.,* 30 S.W.3d 838, 841 (Mo.App. E.D.2000) (citations omitted). "[W]here there is evidence that the conduct of both parties combined and contributed to cause damage, the fact finder should not be precluded from comparing the respective contributions toward such causation made by each." *Id.* (quoting *Earll,* 714 S.W.2d at 936). "A comparative fault instruction must be supported by substantial evidence." *Id.* (citing *Egelhoff,* 875 S.W.2d at 548). "The determinative factor in deciding whether comparative fault is applicable in a particular case depends on the sufficiency of the evidence presented." *Id.* (citing *Earll,* 714 S.W.2d at 936). Whether substantial evidence exists is viewed in the light most favorable to the party who offered the instruction in question. *Business Men's Assurance Co. of Am. v. Graham,* 891 S.W.2d 438, 448 (Mo.App. W.D.1994).

Substantial evidence exists in this record to support the giving of the comparative fault instruction. Although Michael Thompson's treating physician testified that his cancer was caused by smoking, on cross-examination B & W and PM USA elicited testimony that consumption of alcoholic beverages was also a cause of lar-

yngeal cancer and that Michael Thompson's medical records indicated that he had consumed 6 to 36 beers per week dating back to 1985. B & W and PM USA also introduced medical records indicating three years after his cancer surgery, Michael Thompson consumed 6 or more beers per day. In closing argument, PM USA emphasized Michael Thompson's alcohol use, that it could be an independent cause of his cancer, and that there was no way to tell whether his cancer was caused by the cigarettes or alcohol. They also said that discrepancies in the amount of alcohol Michael Thompson used turned the issue into one of "credibility." PM USA also argued that:

> [Michael Thompson] unfortunately got throat cancer either because he smoked or drank. Both are choices he is entitled to make and it was okay for him to make them.

> But living with the results of our choices is not the same as taking responsibility.

> [T]his is not about fault, this is about choice to use or not use a completely legal product and to make and sell a legal product.

Additional evidence was presented by B & W and PM USA as to Michael Thompson's knowledge of some of the health risks of smoking cigarettes and his failure to heed those risks, as well as emphasis on his lack of "serious quit attempts" relating to his "choice" to smoke because he enjoyed it.

While we need not delineate every instance of substantial evidence in this voluminous record which could be considered support for the giving of an instruction on comparative fault, the record contains such support, as evidenced by our prior factual references in this opinion. We also note that both defendants continued to emphasize, both during the trial and in closing arguments, Michael Thompson's "choice"

to smoke, which in reality is an attempt to assign fault.

Furthermore, we see no prejudice to defendants in this case because B & W and PM USA had the opportunity to present evidence from which the jury could still have found B & W and PM USA zero percent at fault and Michael Thompson one hundred percent at fault. Such would have been the same outcome B & W and PM USA seek here, but without completely foreclosing the jury the opportunity to apportion fault to both parties. Neither do we find prejudice to the defendants where, as here, the evidence supports a finding of partial fault attributable to the plaintiff's actions, and the plaintiff elects a potential reduction in awarded damages by requesting a comparative fault instruction, rather than risk a denial of any award.

■■■ Comparative fault is not merely an affirmative defense, which the defendants have a right and an obligation to plead if they so choose. It is a substantive basis of liability which applies to the very core of the manner in which the claim is proven or not proven, and the State of Missouri has chosen for reasons of fairness to adopt a system of comparative apportionment of fault. To permit a defendant to withdraw comparative fault from the jury's consideration would have the effect of reinstating contributory negligence as a complete bar to a plaintiff's claim. B & W and PM USA's sixth point is denied.

## VII. Refusal of Jury Instructions Based on Federal Preemption Issues

In their seventh point, B & W and PM USA contend that the trial court committed reversible error in instructing the jury on the basis of liability in the negligence claim, and in refusing to give their proposed jury instructions which sought to

remove from the jury's consideration whether carcinogens and nicotine in cigarettes were elements of negligent design.[21] The appellants reiterate their previous contention that the Supreme Court's decision in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), discussed *supra*, that *FDA* does not permit a jury to "assess liability based solely on the fact that defendant's cigarettes (like all cigarettes) contained carcinogens and nicotine." Michael Thompson responds that the jury instructions given were properly based on the Missouri Approved Instructions (MAI), that the conflict preemption issue raised by the appellants is misplaced, and that, therefore, the trial court properly refused the non-MAI instructions.

"Whether the instruction was erroneous and, therefore, prejudicial was a question of law to be determined upon the record presented." *Kuzuf v. Gebhardt*, 602 S.W.2d 446, 449 (Mo. banc 1980) (internal quotation marks and citation omitted). "However, we view the evidence and inferences that may be drawn therefrom in the light most favorable to the submission of the instruction." *Mehrer v. Diagnostic Imaging Ctr., P.C.*, 157 S.W.3d 315, 323 (Mo.App. W.D.2005).

 Instructions given must be in compliance with MAI if one exists that is applicable to a particular case. Rule 70.02(b); *see also, Brown v. St. Louis Pub. Serv. Co.*, 421 S.W.2d 255, 257 (Mo.1967) ("When an MAI instruction is applicable, its use is mandatory."). Rule 70.02(b) further provides: "[W]here an MAI must be modified to fairly submit the issues in a

particular case, modifications are permissible so long as they are 'simple, brief, impartial, free from argument, and . . . [do not] require findings of detailed evidentiary facts.'" *Kuzuf*, 602 S.W.2d at 449. "On appeal, we review a non-MAI instruction to determine 'whether the jury [could] understand the instruction and whether the instruction follows applicable substantive law by submitting the ultimate facts required to sustain a verdict.'" *Mehrer*, 157 S.W.3d at 323 (citing *Seitz v. Lemay Bank & Trust Co.*, 959 S.W.2d 458, 462 (Mo. banc 1998) (additional citations omitted). "The verdict is reversed if the offending instruction misdirected, misled, or confused the jury, resulting in prejudicial error." *Harvey v. Washington*, 95 S.W.3d 93, 97 (Mo. banc 2003).

B & W and PM USA do not argue that the instruction for the negligence claim did not follow the applicable MAI form. Instruction No. 12, based on MAI 25.09, used for products liability for negligent manufacture, design or failure to warn, and modified in accordance with MAI 37.01 for comparative fault, stated:

> In Verdict A, on the claim of plaintiff Michael Thompson for personal injury based on negligence, you must assess a percentage of fault to defendant Philip Morris USA Inc. whether or not plaintiff was partly at fault if you believe:

> First, defendant Philip Morris USA Inc. designed cigarettes, and

> Second, the cigarettes contained carcinogens or nicotine, and

---

**21.** Although B & W and PM USA contend in this point that the trial court erred in refusing one of their instructions limiting the jury's consideration of whether nicotine could be considered as "unreasonably dangerous" in a strict liability defective design claim, they failed in their brief to quote the language of the strict liability instruction as given by the trial court or to develop a specific argument of how their proposed instruction would have cured the alleged error. Therefore, we decline to review that alleged instructional error. Rule 84.04(e).

Third, defendant Philip Morris USA Inc. failed to use ordinary care to either design cigarettes to be reasonably safe prior to plaintiff Michael Thompson's injury or adequately warn of the risk of harm from the carcinogens or nicotine prior to July 1, 1969, and

Fourth, such failure directly caused or directly contributed to cause damage to plaintiff.

Instruction No. 13 was a similar instruction with B & W as the named defendant, but with the failure to warn element omitted, based on the evidence that Thompson did not smoke B & W cigarettes until after 1969.

B & W and PM USA do complain, however, that the trial court erred by "expressly inviting the jury to assess liability based on a theory that is preempted by federal law," and that the trial court further erred in rejecting certain limiting instructions which they offered on that issue to correct the problem. Specifically, B & W and PM USA reargue their contention that *FDA*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121, forecloses a finding of liability based on the fact their cigarettes, "like all cigarettes," contain carcinogens and nicotine. B & W and PM USA further contend that to correct this error, the trial court should have given a "clarifying" instruction they offered. Instruction "A" stated: "The issue of whether conventional cigarettes containing nicotine are negligently designed is withdrawn from the case and you are not to consider such issue in arriving at your verdict." Because B & W and PM USA do not reference any MAI compliance for this instruction in their brief, we assume that it was either a non-MAI instruction, or offered as a limiting instruction pursuant to MAI 34.02, relating to Instruction Nos. 12 and 13.

Without rehashing our extensive analysis of *FDA*, as presented in the first point, B & W and PM USA's reliance on *FDA* is misplaced. We do not read *FDA* to preclude state law liability claims. The evidence in this case supported the instructions as given by the trial court. To instruct otherwise would not have followed applicable substantive law and would have misdirected the jury. This point is denied.

## VIII. Refusal of Jury Instructions Regarding Failure to Warn After 1969

In a related point, B & W and PM USA contend that the trial court committed reversible error requiring a new trial on the grounds that the court refused their jury instructions withdrawing from the jury's consideration the issue of the duty to warn of the risks of smoking after July 1, 1969, based on the FCLAA. This is so, even though the instructions that were given did not list the duty to warn as an element of liability, except in the negligence instruction and the separate strict liability failure to warn instruction pertaining to PM USA only, and that instruction was limited to warnings prior to July 1, 1969. B & W and PM USA contend that they were entitled to these additional withdrawal instructions because Michael Thompson was repeatedly allowed to introduce testimony that B & W and PM USA "should have provided additional post–1969 warnings other than those required by Congress," and that "the jury could believe that it was free to assess liability based on a determination that defendants should have provided additional or different post–1969 warnings."

B & W and PM USA requested that the trial court give the following jury instructions, but the court refused. Instruction "I" stated: "The issue of whether defendant Philip Morris USA Inc. should have given Mr. Thompson any additional

warning of the risks of cigarette smoking after July 1, 1969 is withdrawn from the case and you are not to consider such issue in arriving at your verdict." Similarly, Instruction "J" stated: "The issue of whether defendant Brown & Williamson Tobacco Corporation should have given Mr. Thompson any additional warning of the risks of cigarette smoking after July 1, 1969 is withdrawn from the case and you are not to consider such issue in arriving at your verdict."

■ Again, without rehashing our extensive analysis in the first point of *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), we acknowledge that the FCLAA precludes claims against tobacco manufacturers based on their duty to warn of the risks of smoking cigarettes beyond those mandated by Congress after July 1, 1969. However, in this case, the jury instructions were very specific, followed the appropriate MAI requirements, and did not permit the jury to assess fault based on post–1969 duty to warn. Further, our review of the massive transcript in this case reveals no substantial prejudice to the appellants on this point. The circuit court granted nearly every objection B & W or PM USA made with regard to preemption issues. Of the few instances of testimony allowed over objection, the testimony was either allowed on other grounds or with a clarification of the time period prior to 1969.[22] We find, therefore, that the trial court committed no error in refusing to give the proposed instructions.

## IX. Alleged Error in Admission of Testimony Relating to Failure to Warn After 1969

■ In this related point, B & W and PM USA contend that the trial court erred in admitting any evidence that they should have provided additional warnings after 1969 because "it invited the jury to assess liability based on allegations that were preempted by the Labeling Act." They contend that this evidence was prejudicial because it led the jury to decide the case on an issue that was not properly before them and that they are, therefore, entitled to a new trial.

We give substantial deference to the trial court's decisions to admit evidence, which we disturb only upon a showing of abuse of discretion. *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991). "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Id.* (quoting *Richardson v. Colonial Life & Accident Ins. Co.*, 723 S.W.2d 912, 915 (Mo.App.1987)).

Again, the record reveals that the trial court was clearly aware of the limitations posed by the FCLAA and the holding in *Cipollone* and carefully considered the admission of evidence, granting many objections to evidence on the grounds that it

---

**22.** Interestingly, B & W and PM USA cite, as an example, testimony elicited from Christi Thompson by one of their own attorneys on cross-examination, on the question of whether she had seen the federally mandated warnings printed on cigarette packages. Christi Thompson's response was: "I never paid attention to the warning labels.... If you had the commercials, the advertisements that are on now, I've seen more now in the last couple of weeks than I have in a life time. Maybe if those were shown back then, that would have made an impact." Appellants' motion to strike was refused. B & W and PM USA make no effort to explain why the testimony regarding new, additional warnings of the risks of smoking recently made by B & W and PM USA in advertisements, which go beyond those originally required by federal law, was not admissible.

was impermissible as evidence of a post–1969 duty to warn beyond that mandated by federal law. We find no abuse of discretion by the trial court in the admission of evidence. This point is denied.

### X. Error in Admission of Certain Internal Documents Asserted as Privileged

In their final point, B & W and PM USA contend that the trial court erred in admitting certain internal company documents which they contend, generally, were privileged "under the attorney-client privilege, the joint defense ('common interest') privilege, and/or the attorney work product doctrine." In their brief, B & W and PM USA do not describe the content of the exhibits, identify which privilege applies, explain why the privilege applies, or specifically why the trial court erred in admitting a particular exhibit. B & W and PM USA admit that they request reversal of the trial court's ruling on the admissibility of the documents in contention "to avoid the possibility of a future claim of waiver based on an alleged failure to appeal such rulings." B & W and PM USA cite no Missouri authority to support their claims of privilege.

While the appellants cite *United States v. de la Jara*, 973 F.2d 746, 749 (9th Cir. 1992), for the proposition that forced production of documents does not waive privilege, and *Sackman v. Liggett Group, Inc.*, 173 F.R.D. 358, 365 (E.D.N.Y.1997), for the proposition that the disclosure of stolen documents does not waive privilege, appellants do not even go so far as to describe which of these cases apply to which specific evidence, much less how the trial court erred in admitting it. Without more, we simply are not presented enough information upon which to rule.

"When counsel fail in their duty by filing briefs which are not in conformity with the applicable rules and do not sufficiently advise the court of the contentions asserted and the merit thereof, the court is left with the dilemma of deciding that case (and possibly establishing precedent for future cases) on the basis of inadequate briefing and advocacy or undertaking additional research and briefing to supply the deficiency." *Thummel v. King*, 570 S.W.2d 679, 686 (Mo. banc 1978). "It is not the function of the appellate court to serve as advocate for any party to an appeal." *Id.* We, therefore, decline to review this point.

The judgment of the trial court as to all points is affirmed.

SPINDEN, P.J., and HOLLIGER, J., concur.